DELAWARE OPEN MRI RA-
DIOLOGY ASSOCIATES,
P.A., Petitioner,

v.

Howard B. KESSLER, et
al., Respondents.

Howard B. Kessler, et al., Plaintiffs,

v.

George J. Broder, et al., Defendants.

C.A. No. 275–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 18, 2006.
Decided: April 26, 2006.

Cathy L. Reese, Esquire, Titania R. Mack, Esquire, Greenberg Traurig, LLP, Wilmington, Delaware; Douglas Evan Ress, Esquire, Kaufman, Coren & Ress, PC, Philadelphia, Pennsylvania, Attorneys for Respondents/Plaintiffs.

David E. Wilks, Esquire, Thad J. Bracegirdle, Esquire, Buchanan Ingersoll PC, Wilmington, Delaware; Howard D. Scher, Esquire, Steven E. Bizar, Esquire, Eliot G. Long, Esquire, Buchanan Ingersoll PC, Philadelphia, PA, Attorneys for Petitioner/Defendants.

## OPINION

STRINE, Vice Chancellor.

This case is another progeny of one of our law's hybrid varietals: the combined appraisal and entire fairness action. In this case, the key question is whether the minority stockholders of Delaware Open MRI Radiology Associates, P.A. ("Delaware Radiology") received fair value in a squeeze-out merger with an acquisition vehicle of the majority stockholders, Delaware Open Acquisition, P.A. ("Delaware Acquisition"). The majority and minority stockholders were all radiologists who formed Delaware Radiology to capture additional revenues by owning the centers at which patients would be scanned by MRI machines (the "MRI Centers"). The squeeze-out merger at Delaware Radiology occurred after the radiologists' underlying radiology practice split up, turning the eight Delaware Radiology stockholders into two discrete blocks. The majority group, the "Broder Group," was comprised of five of the stockholders and controlled 62.5% of the Delaware Radiology shares. The minority group, the "Kessler Group," was comprised of three of the stockholders and owned the remaining 37.5% of the Delaware Radiology shares.

Although the dispute requires me to apply both the principles applicable under the appraisal statute and under the common law governing conflicted mergers, the two primary questions of interest to the parties do not differ by the nature of the claim. Those questions are: was the merger price fair and, if not, what was the extent of the underpayment to the minority stockholders?

In this opinion, I conclude that the merger price of $16,228.55 per share of Delaware Radiology was not fair. Finding no difference between the award the Kessler Group should receive in appraisal or in equity, I award them the amount that I find to be equivalent to their pro rata share of Delaware Radiology's appraisal value on the date of the merger, $33,232.26 per share, or a total consideration of $4,984,838.71. That award will be supplemented by an award of pre- and post-judgment interest at the 6.9% rate requested by the Kessler Group, compounded monthly.

## I. The Procedural Status Of The Litigation

Before describing the relevant facts that are central to this dispute, the procedural underbrush must be cleared away. The merger giving rise to this dispute was effected on January 20, 2004.

The first lawsuit brought in response to the merger was actually filed by Delaware Radiology, as the surviving corporation in the merger, in February 2004. The members of the Kessler Group had expressly preserved their appraisal rights in a letter

to the Broder Group, and the members of the Broder Group, through Delaware Radiology, wanted to bring the dispute about value to a head.

In June 2004, the members of the Kessler Group filed a complaint, alleging that the members of the Broder Group (all of whom were directors of Delaware Radiology and Delaware Acquisition, the acquisition vehicle) had breached their fiduciary duties by effecting the merger in a procedurally and substantively unfair manner.

Rather than confuse the reader with references to "respondents/plaintiffs" and "petitioners/defendants," I will generally refer to the minority stockholders, who are seeking damages based upon a determination that the merger was unfair, as simply the Kessler Group. The Kessler Group is comprised of three radiologists: Drs. Howard Kessler, Andrew Shaer, and Locke Barber. Each member of the Kessler Group owned 50 of the 400 outstanding shares of Delaware Radiology. The Kessler Group's cumulative ownership therefore was 37.5%, or three-eighths, of Delaware Radiology.

Likewise, I will refer to the parties seeking to vindicate the fairness of the merger as the Broder Group.[1] The Broder Group is comprised of five radiologists: Drs. George Broder, Michael Clair, William Hartz, Phillip Moldofsky, and Jay Rosenblum. As was the case with the Kessler Group, each member of the Broder Group owned 50 shares of Delaware Radiology. The Broder Group, then, collectively owned 62.5%, or five-eighths, of Delaware Radiology. As a result of the merger, the Broder Group acquired total ownership of Delaware Radiology.

## II. Factual Background

### A. The Radiology Practice Of The Kessler And Broder Groups

This case has its origins in the common radiology practice in which the Kessler and Broder Groups had interests. Before Delaware Radiology was formed, the members of the Broder and Kessler Groups were practicing together in a radiology practice in Rockledge, Pennsylvania known as Fox Chase Medical Center Radiology Associates, P.C. ("Fox Chase"). Fox Chase was originally formed by four members of the Broder Group: Broder, Hartz, Moldofsky, and Rosenblum. The remaining member of the Broder Group, Clair, joined Fox Chase in September 1985. Kessler joined Fox Chase in January 1985, and the remaining two Kessler Group members, Shaer and Barber, joined in approximately 1989–1990.

Each of these doctors had an equal interest in Fox Chase, which derived a large portion of its business from providing radiology services for two Philadelphia-area hospitals: Fox Chase Cancer Center and Jeanes Hospital. Fox Chase also provided radiology services for a small imaging clinic owned by Jeanes Hospital.

### B. The Partners Of Fox Chase Decide To Invest In MRI Centers

In 1996, the partners in Fox Chase began considering a strategy to capture more of the total revenue stream flowing from patients who required radiology services.[2]

1. Tri–State Imaging Consultants, L.L.C. ("Tri–State"), which served as the management company of the MRI Centers beginning in 2001, also was named as a defendant in this action based upon its alleged aiding and abetting of Delaware Radiology's fiduciary breaches, but that portion of the litigation was dismissed after summary judgment mo-

tion practice. In addition, Delaware Acquisition, the entity used by the Broder Group to merge with Delaware Radiology, also is listed as a defendant in this action.

2. Shaer was the driving force behind the idea to branch out into the entrepreneurial enterprise of owning MRI Centers. Tr. 678–84.

Specifically, they wanted to capture the portion of the revenue stream that went to the entity owning the patient-scanning equipment, in particular, MRI machines. By owning the MRI Centers and doing the diagnostic "reads" of the patient images, the partners at Fox Chase would collect more of the total treatment revenue. As important, because they would own the MRI Centers, the partners at Fox Chase would have control over who did the patients' MRI reads, thus providing them with a more assured stream of this radiology work. As Broder put it, owning the MRI Centers would make radiologists the "masters of [their] own destiny" by allowing them to control the profits of the MRI Centers.[3]

This strategy of opening multiple MRI centers is feasible because a radiologist can read the MRI over the internet at a location remote from the location of the MRI machine. The partners in Fox Chase opened their first MRI Center in 1998 in northeast Philadelphia, through Jeanes Radiology Associates, P.C., which was owned in equal shares by the eight partners of Fox Chase. Jeanes Radiology, essentially the Pennsylvania precursor to Delaware Radiology, was founded to own at least one of the Pennsylvania MRI Centers the partners of Fox Chase hoped to open.

The formation of the entity whose value is at issue in this litigation—Delaware Radiology—resulted from the desire of the partners in Fox Chase to take advantage of the more favorable insurance reimbursement and medical malpractice rates then available in Delaware. To enter the Delaware market, the partners had to form a Delaware entity and obtain licenses to practice medicine in Delaware.[4]

For business reasons, the partners also wanted to join up with a respected Delaware physician who could help secure patients for the MRI Centers they would open in Delaware. To that end, the partners enlisted a locally-renowned doctor, Steven Edell, as a joint venturer. Kessler had a social relationship with Edell, and Kessler and Shaer apparently convinced Edell that investing in the MRI Centers would be beneficial.[5] The division of responsibility was relatively clear. Delaware Radiology would put up capital to form the MRI Centers and would ensure that high-quality MRI reading services were provided to the patients coming through the Centers. Meanwhile, Edell would provide input into possible locations for MRI Centers and use his plentiful contacts in the Delaware medical community to ensure that the MRI Centers would benefit from patient referrals. Together, Delaware Radiology and Edell would own, in varying percentages, the MRI Centers that would be opened in Delaware and would share control under the terms of the LLC agreements governing the Centers.

Delaware Open MRI, L.L.C. ("Delaware I"), a Delaware limited liability company, was the first MRI Center they opened. It opened in Newark, DE in 1998. Delaware Radiology received a 70% ownership in Delaware I. Edell received the remaining 30%. Delaware I was profitable quickly, which led Delaware Radiology and Edell to open a second center, Delaware Open MRI II, L.L.C. ("Delaware II"), in Wilmington, DE in 1999. Edell received a higher 40%

3. Tr. 15.

4. For regulatory reasons, it appears that insurance payments for MRI reading fees had to flow through a Delaware-based entity. Likewise, it was necessary for the radiologists diagnosing patients receiving MRI scans in Delaware to be licensed to practice medicine in Delaware.

5. Tr. 686.

share of Delaware II, with Delaware Radiology receiving 60%. Delaware Radiology was named as the managing member in the LLC agreements for both Delaware I and Delaware II.

### C. The Initial Allocation Of The Revenues For Reading MRI Scans

As has been explained, a central purpose of the formation of the MRI Centers was to enable the partners in Fox Chase to secure a more certain flow of patients needing radiology services. But Fox Chase itself could not directly perform the reads for the Delaware-based MRI Centers because, for various regulatory reasons, a Delaware entity comprised of Delaware-licensed physicians had to be responsible for that function. As a result, not all of the partners in Fox Chase were even shareholders in Delaware Radiology at its formation. Initially, Shaer was named as the sole director, President, Secretary, and Treasurer of Delaware Radiology because he was already licensed in Delaware.[6] Eventually, all members of the Broder and Kessler Groups became shareholders, and all eventually were added to the board of directors.

Under the operating agreements of Delaware I and Delaware II, Delaware Radiology was assigned the responsibility for providing "MRI diagnostic radiology services."[7] These radiology services were to be provided pursuant to a professional services agreement entered into between each MRI Center and Delaware Radiology. Essentially, these agreements called for Delaware Radiology to provide the reads of the MRI scans that were generated at the MRI Centers. As compensation for these radiology reading services, Delaware Radiology was to be paid 15% of the total revenues of Delaware I and II (the "Reading Fees"). Like Delaware Radiology, Edell got a payment from Delaware I and II for his marketing and administrative work, which, pursuant to the Delaware I operating agreement signed in October 1998, was 5% of the revenues of Delaware I and, pursuant to the Delaware II operating agreement signed in May 1999, was 7.5% of the revenues from Delaware II.

Although the professional services agreements made Delaware Radiology the entity responsible for providing the reads, the actual reads for Delaware I and II upon their opening were performed by radiologists then practicing at Fox Chase. The radiologists who did the work either did the read at Fox Chase or from a home computer. When Delaware I began operating in 1998, there were only three radiologists at Fox Chase qualified to provide MRI reads: (i) one member of the Broder Group, Clair; (ii) one member of the Kessler Group, Shaer; and (iii) one employee of Fox Chase, Brumberger. The other members of the Kessler and Broder Groups, at that time, were not qualified to read MRI scans. That reality was not significant then as a business matter. Delaware Radiology simply passed the 15% fee it was entitled to receive through to Fox Chase, and all the read work was performed at Fox Chase by its three qualified readers. Because the eight stockholders of Delaware Radiology were the eight partners of Fox Chase, the reading profits from the Centers were shared equitably among the eight owners—the members of the eventual Kessler and Broder Groups.

### D. The Beginning Of The Schism

The stability of this arrangement was short-lived. In June 1999, Kessler, Shaer

---

6. Because he did so much work in connection with opening Delaware I and II, Shaer was paid a development fee. *Id.* at 700.

7. Op. Agmt. § 6.1.

and Barber—i.e., the Kessler Group—left the Fox Chase practice to form their own radiology practice, Bucks County Radiology Associates, P.C. ("Bucks County"). Bucks County was formed to provide radiology services to two Philadelphia-area hospitals: Graduate Hospital and Warminster Hospital. Brumberger, one of the qualified MRI readers at Fox Chase, also took his services to Bucks County with the Kessler Group. As a result, two of the three MRI readers at Fox Chase—Shaer and Brumberger—were now at Bucks County.

This posed an obvious problem for Delaware Radiology and Fox Chase. Five of the eight owners of Delaware Radiology were now at Fox Chase, while three were at Bucks County. Only one of the qualified MRI readers, Clair, was left at Fox Chase. Thus, the simple funneling of the 15% Reading Fee to Delaware Radiology through to Fox Chase would no longer result in an equitable distribution of read revenue to the eight Delaware Radiology stockholders, as only five of them remained partners in Fox Chase.

This split created issues for the allocation of MRI reads from the MRI Centers. In contemplation of the Kessler Group leaving Fox Chase, the Kessler Group's attorney proposed that, initially, Fox Chase would be allocated five-eighths of the reads and Bucks County would receive three-eighths.[8] The Kessler Group proposal also contemplated that upon Brum-

berger becoming a full partner in Bucks County, the MRI Centers would allocate 50% of the reads to Bucks County and 50% of the reads to Fox Chase. But the Broder and Kessler Groups never came to agreement on this proposal.

Instead, immediately after the Kessler Group left Fox Chase, Clair, a Broder Group member, took over the responsibility for allocating the MRI reads. Initially, the Broder and Kessler Groups agreed that two-thirds of the MRI reads would be allocated to Bucks County, because Bucks County had two of the three physicians who had been performing the reads. That is, the number of reads allocated tracked the relative reading capacity of Bucks County and Fox Chase at that time.

In early 2000, Fox Chase's capacity for MRI reads increased when it hired a new radiologist, Dr. Kofsky, who was competent to provide reads, and when Hartz, a Broder Group member, acquired the necessary proficiency to provide MRI reads. Therefore, the Broder Group, as the controlling block of Delaware Radiology,[9] decided to change the allocation of MRI reads, without apparent complaint from the Kessler Group. Clair, then, began referring 50% of the reads generated by the MRI Centers to Bucks County, and the remaining 50% of the reads went to Fox Chase. This allocation remained in place until November 2001, when Brumberger left the Kessler Group and returned to

8. Jt. Ex. 27 at p. 4. This letter also recognized the possibility that Fox Chase would not have adequate personnel to handle five-eighths of the reads and would need to enter into a cross-coverage agreement with Bucks County. *Id.* at 5. Similarly, in May 1999, the Broder Group drafted a proposal to get the Kessler Group to stay on at Fox Chase, which discussed dividing Reading Fees equally. This proposal was not accepted by the Kessler Group. Jt. Ex. 20.

9. Broder was less than clear as to the capacity in which the Broder Group acted when determining how to allocate the reads. Initially, he stated it was in the Broder Group's capacity at Delaware Radiology. Tr. 85–86. In response to rather obvious prompting from his own counsel to change his testimony, Broder later stated that the allocation decision was made at Fox Chase. Tr. 335–36. I find that the Broder Group used its majority status to dictate the allocation.

Fox Chase to work with the Broder Group.[10] At this time, the Broder Group decided to reduce the Kessler Group's reads again, and Clair began referring only one-third of the MRI reads to the Kessler Group. When the reads allocated to Bucks County were reduced to one-third, the Kessler Group's allocation of reads fell slightly below their pro rata ownership, which was three-eighths, of Delaware Radiology.[11] The Kessler Group did not object to this new allocation that began in November 2001.

### E. The Broder And Kessler Groups Muddle Through For Awhile

For those with a half-full perspective on life, it is uplifting that the Broder and Kessler Groups were able to muddle through in operating Delaware Radiology until the summer of 2002 without a major meltdown in relations. Having left Fox Chase, the Kessler Group should have recognized that there would be some hard feelings and that its economic interests were now aligned less than perfectly with the Broder Group's.

Nonetheless, the parting of ways at Fox Chase did not initially affect the ability of the Kessler and Broder Groups to conduct the business of Delaware Radiology. All shareholders continued to sit on Delaware Radiology's board of directors.[12] Shaer, a Kessler Group member, continued to serve as President of Delaware Radiology and Medical Director of Delaware I and II. In fact, after the split, the Kessler and Broder Groups opened more jointly-owned MRI Centers in Pennsylvania using various Pennsylvania entities and discussed the possibility of opening a third MRI Center in Delaware through Delaware Radiology.

In addition, in April 2001, the Broder Group retained Michael Carr "to consult and help restructure the management of the non-medical aspects" of Delaware Radiology's business.[13] Initially, Carr was hired as an employee of Fox Chase, and the Kessler Group agreed to "try out" Carr to see if Delaware Radiology would benefit from his management.[14] Carr began providing services to the MRI Centers, including those managed by Delaware Radiology, while he was still on the Fox Chase payroll. Within three to four months of joining Fox Chase, Carr officially became the first employee of Tri–State. Tri–State is an entity that was formed by the Broder Group in 2001, which the Broder Group envisioned would provide management to its Centers. When Carr became an employee, Tri–State then became the entity responsible for the day-to-day, non-medical management of the MRI Centers.[15] Tri–State's responsibilities to the MRI Centers included performing all accounting functions, all human resource functions, facilities management, oversight of information technology, marketing, and business development.[16] Before Tri–State handled the management, the Delaware Radiology shareholders had done that themselves. On December 12, 2001, Delaware Radiology proposed to Edell that Tri–State be paid 1% of the MRI Centers' cash collections in order to compensate it for providing management services. Edell agreed.

**10.** Tr. 806.

**11.** Tr. 85.

**12.** Rosenblum was not yet a shareholder or on the board of directors, presumably because he was not yet a Delaware-licensed physician.

**13.** Jt. Ex. 33.

**14.** Tr. 737.

**15.** *Id.* at 366.

**16.** Jt. Ex. 272.

After Tri–State began managing Delaware Radiology, it implemented a new system of cash collections and revenue distribution. Before June 2002, insurance reimbursements payable for services rendered at Delaware I and II would go into a Delaware Radiology account. The revenue was then dispersed—15% for MRI reads, 5% or 7.5% to Edell in the case of Delaware I and II, respectively, 1% to Tri–State, and the remainder to the MRI Center where the scan was performed.[17] The 15% read revenue was passed on to Fox Chase and Bucks County in proportion to the then-existing allocation of reads.

In June 2002, while the Kessler Group still was actively involved in Delaware Radiology and Shaer served as President, Tri–State formed a "concentration account," which received all the incoming reimbursements and collections from the various MRI Centers and sent them up to Fox Chase and the individual MRI Center. The insurance companies, then, made payments directly to the Tri–State concentration account. This essentially commingled the funds of a number of MRI Centers, including the funds of some non-Delaware MRI Centers co-owned by the two Groups and of some MRI Centers owned exclusively by the Broder Group, in one account until the distributions were made. The creation of this concentration account was not a matter of controversy among the directors of Delaware Radiology at that time.

F. *The Schism Between The Broder And Kessler Groups Rips Open*

The rift between the Kessler and Broder Groups became a chasm in August 2002.

On August 13, the Broder Group decided that Fox Chase had "ramped up enough" to handle more reads, and Clair presented Shaer with a schedule of reads, which indicated that the Kessler Group's reads would be reduced from one-third to one-sixth.[18] Now, the Kessler Group objected.

In response to this news, Kessler called Broder on August 15 to express his dismay at the MRI read reduction and to request a meeting. On August 16, Kessler sent a letter to the attorney who represented Delaware Radiology, Arthur Brandolph, requesting "all of the important legal documents for each entity in which [the Kessler Group] own[s] an interest" and "an independent audit of each entity" as well.[19]

Kessler then met with Broder on August 21 in Brandolph's office. After exchanging niceties, Kessler asked Broder, again, to reconsider the reduction in reads. Broder maintained that the reduction in reads was a logical progression and that the reduction would occur.[20] Next, they discussed the "divorce" that had occurred when the Kessler Group left Fox Chase, and, for the first time, Broder indicated that the Broder Group would be interested in buying out the Kessler Group's interest in the MRI Centers.[21] Kessler, though, informed Broder that the Kessler Group would prefer to be a buyer, not a seller.[22] Finally, Kessler shared that the Kessler Group would be competing with the Broder Group for the contract to provide radiology services to Jeanes Hospital.

The decision to bid for the Jeanes Hospital contract clinched the mutual enmity between the two Groups. Although the

17. Tr. 456–57.

18. *Id.* at 85.

19. Jt. Ex. 47.

20. Tr. 109.

21. *Id.*

22. *Id.*

Kessler Group says that it bid only after learning that the Broder Group had no chance of retaining the business, the Kessler Group had to know that this competition would wound the Broder Group, which had provided services at Jeanes Hospital through Fox Chase for nearly twenty years. According to Broder, he had been told in July by the Kessler Group that it would not be bidding on the contract in competition with Fox Chase. Therefore, when Broder learned at the August 21 meeting that the Kessler Group would in fact bid, Broder was "probably ... the most shocked [he had] ever been in [his] life." [23]

Within a week of learning that the Kessler Group was competing with Fox Chase, Broder received even worse news. On August 26, he met with a representative of Jeanes Hospital who informed him that the Broder Group would lose the contract and that the Kessler Group likely would be awarded the contract. The Broder Group officially received word on October 15 that it would not receive the Jeanes Hospital contract, and the Broder Group ceased providing radiology services for Jeanes Hospital on November 15, the same day that the Kessler Group began providing the services. After losing that contract, the Broder Group's MRI readers had more time on their hands, and within a month, the Broder Group, through Clair, completed the trend in reducing the Kessler Group's reads and no longer allocated any read work to the Kessler Group. As Broder candidly stated at trial, his view was that the Kessler Group's entitlement to read work had ended when the three radiologists left Fox Chase. [24]

Litigation between the Broder Group and the Kessler Group erupted. In November 2002, the Broder Group sued the Kessler Group over its competition for the Jeanes Hospital contract. The Kessler Group responded by suing the Broder Group in Pennsylvania for wrongfully reducing its share of the MRI reads from the commonly-owned MRI Centers in Pennsylvania and Delaware. [25]

The feud also resulted in corporate governance changes at Delaware Radiology. On November 6, in his role as President of Delaware Radiology, Shaer called a special stockholders meeting to discuss financial and ownership matters. In lieu of attending the stockholders meeting, on November 20, the Broder Group issued written stockholder consents removing the Kessler Group from Delaware Radiology's board of directors and postponing the annual board of director meeting. [26] The Broder Group also installed one of its own, Broder, in place of Shaer as President of Delaware Radiology, and replaced Shaer with Clair as Medical Director of the MRI Centers,

23. *Id.* at 110–11.

24. *Id.* at 203–04.

25. Neither party has asserted that findings in the Pennsylvania litigation have any collateral effect on the issues presented to me at trial. The Pennsylvania litigation resulted in an injunction that required the Broder Group to provide one-third of the reads generated by the commonly-owned entities in Pennsylvania and Delaware to the Kessler Group. *See Kessler v. Broder,* 851 A.2d 944 (Pa.Super.2004); *Kessler v. Broder,* 2003 WL 21782433, at *1 (Pa.Com.Pl. July 28, 2003). Perhaps for that reason, the Kessler Group has not sought a remedy for any allocation of work before the merger in this case, and it does not appear that its expert's valuation was increased by Reading Fees from prior years. But the scope and duration of that injunction is not clear to me. The parties have not expended any effort to elucidate me on the precise status of the Pennsylvania litigation and have proceeded as if it has no effect on this case. Any inefficient overlap, therefore, is a burden they have assumed voluntarily.

26. Jt. Ex. 58.

including Delaware I and II. The Kessler and Broder Groups next interacted at a contentious Delaware Radiology shareholder meeting held on December 23, 2002.[27]

### G. The Final Year Of Joint Ownership

During 2003, a period in which they were battling in litigation, the Broder and Kessler Groups continued to be shareholders in Delaware Radiology. Although they had informally discussed a separation of their interests in Delaware Radiology in August 2002, by spring 2003, the Broder Group began planning for such a division in earnest, albeit in an erratic and confusing manner.

By March 2003, the Broder Group was functioning as a coherent majority block at Delaware Radiology. Using that power, it increased, retroactively to September 2002, Tri–State's management fee to 2% of total cash collections. That same month, the Reading Fees for Delaware I were increased from 15% to 17.5% of revenues; in exchange for this, Edell extracted an increase in his take from 5% to 7.5% of revenues from Delaware I, consistent with his original take from Delaware II.

At a special shareholder meeting of Jeanes Radiology on May 28, 2003,[28] the Broder Group expressed its intent to pursue a valuation of the various MRI Centers, including Delaware I and II, with a view towards some sort of separation. The Broder Group retained Timothy C. Reed of Diversified Medical Management to perform the valuation. On July 15, the Broder Group formed the entity, Delaware Acquisition, that it intended to use as its acquisition vehicle in a squeeze-out merger with Delaware Radiology, although the Kessler Group was unaware of this occur-

rence. What the Kessler Group did know was that the Broder Group was thinking about a transaction that would eliminate the Kessler Group's ownership in the entities that controlled the various MRI Centers. For example, on July 30, the Broder Group's attorney, Douglas Coopersmith, wrote a letter to the Kessler Group's attorney, Eric Wilenzik, informing him that the Kessler Group could provide information to Reed to assist in the valuation.[29] The Kessler Group apparently declined this invitation.

But the Broder Group's desire to eliminate the Kessler Group's interest was less than firm. In the same time period, Tri–State was performing serious business development work for Delaware Radiology on the opening of new MRI Centers. In May, the Delaware Radiology board of directors—which by then was exclusively comprised of the Broder Group members—discussed the idea of opening a third Delaware MRI Center with Edell in Middletown, DE ("Delaware III"). In July, Delaware III entered into a lease for space that it would use in Middletown. Meanwhile, Tri–State, through Carr, had also been working for Delaware Radiology on the concept of opening yet a fourth MRI Center with Edell, in this instance in Dover, DE ("Delaware IV"). Planning for Delaware IV was well under way by late autumn of 2003.

By late 2003, the ambiguity about the Broder Group's desires was piquant. In October, while Reed was valuing Delaware Radiology and the Broder Group had begun the steps to squeeze out the Kessler Group, the Broder Group's attorney sought personal guarantees from the Kessler Group, at the request of the Wilmington Savings Fund Society, in connection

**27.** Jt. Ex. 64.

**28.** Jt. Ex. 91.

**29.** Jt. Ex. 106.

with financing an expansion of Delaware I.[30] In the exchange of communications, the Kessler Group's attorney developed the impression that the Broder Group was also seeking guarantees from the Kessler Group in connection with a new MRI Center and requested more information.[31] In response, the attorney for the Broder Group sent the pro forma projections for both this new MRI Center, which was Delaware III, and the expansion of Delaware I to the Kessler Group. But his letter otherwise only mentioned the expansion of Delaware I. The Kessler Group then proposed that the Delaware Radiology shareholders and Edell loan the money necessary for the financing, rather than seeking it from a third-party lender. The negotiation over financing continued, albeit in a manner that appears only to have concerned Delaware I, until mid-November, and it appears that the Broder Group and Edell ultimately provided the loans for the expansion.[32]

During this time frame, the Broder Group must have been actively planning the merger because, on December 10, the Broder Group members executed consents in their capacity as directors of Delaware Radiology to approve the merger. On December 15, the Broder Group first formally notified the Kessler Group of a merger whereby the Kessler Group would be squeezed out of Delaware Radiology. By October 31, Reed had finished his valuation work, and his valuation of Delaware Radiology was included in this December 15 notice along with the merger agree-

ment. The merger agreement indicated that Delaware Radiology would merge with Delaware Acquisition, and Delaware Radiology would be the surviving corporation. Using Reed's work as a premise for the merger terms, the merger agreement called for merger consideration of $16,257.33 per share.[33]

Along with the merger agreement, the Broder Group also sent notice of a special meeting of shareholders that would be held on January 5, 2004 to vote on the proposed merger. At the Kessler Group's request, the meeting was postponed until January 19.

■ On January 9, the individual members of the Kessler Group submitted written demands for appraisal of their shares pursuant to 8 *Del. C.* § 262. In addition, they agreed not to attend the special meeting to be held on January 19. In a January 16 letter, the Broder Group's attorney confirmed the arrangement whereby the Broder Group would meet on January 19 to approve the merger, and the Kessler Group would not attend but still preserved "all of its claims against the Broder Group" except for any claims "arising out of or related to the propriety of the Notices, the presence of a quorum at the Meeting, the sufficiency of the vote to approve and adopt the merger and the other action items, other needed corporate action to approve, adopt and make the merger legally binding and other claims arising from or related to the manner in which the Meeting was conducted."[34] As

---

30. *See* Jt. Ex. 403 for the various communications.

31. Jt. Ex. 390.

32. Jt. Ex. 124.

33. Pursuant to the merger agreement, this price was adjusted downward to $16,228.55,

which became the final merger price, based on excess working capital and distributions.

34. Jt. Ex. 151. In prior summary judgment motion practice, the Broder Group argued that the Kessler Group, through this letter, waived its right to bring any action other than an action for appraisal. Waiver, of course, only occurs when a party voluntarily and

contemplated, the Broder Group met and approved the merger, and the merger became effective the next day—January 20. The final per share merger consideration, after adjustments, was $16,228.55, which would have provided each minority stockholder with $811,427.50.

### G. *After The Merger, Three New Delaware MRI Centers Open*

Soon after the merger, the Broder Group capitalized on the substantial planning already underway for the new MRI Centers in Middletown and Dover. Indeed, as to the Middletown Center, the Broder Group did not even wait until the merger was effected.

In December 2003, Delaware Open MRI III L.L.C. (what was previously defined as "Delaware III") was formed to own the Middletown MRI Center, and in July 2003, Delaware III had leased the space where this Center would be located.[35] The ownership structure of Delaware III was a bit different from Delaware I and II. Dela-

ware Radiology was accorded ownership of 51.4%, Edell 40%, and Carr, of Tri–State, was granted an 8.6% interest. Delaware III became operational in April 2004.

The Dover MRI Center—which was owned through Dover Open MRI LLC (what was previously defined as "Delaware IV")—was opened in July or August 2004. Delaware IV was formed eight days before the merger. Although the Delaware IV lease was not formalized until January 27, the lease was essentially ready for signature before the merger.

No doubt, the decision to hold off the lease signing was tactical and influenced by legal risk. Those tactics also influenced the ownership structure for Delaware IV. Rather than participate in Delaware IV through Delaware Radiology, the Broder Group participated in Delaware IV through a new entity, Tri–State G.P. LLC. Tri–State G.P. LLC was owned by the Broder Group, along with Carr. Like the other Delaware MRI Centers, Delaware

---

knowingly relinquishes a known right. *See Realty Growth Inv. v. Council of Unit Owners,* 453 A.2d 450, 456 (Del.1982); DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 11.2 (2005). I agreed with the Broder Group that the Kessler Group's agreement that it would not challenge actions required "to approve, adopt and make the merger legally binding" clearly waived any claims for rescission or rescissory damages. Essentially, the Kessler Group recognized that the Broder Group had the necessary number of votes to effect the merger and waived any argument that the merger should be unwound for procedural reasons. But the Broder Group also argued that the January 16 letter precluded an entire fairness claim. I rejected that argument, determining that the January 16 letter did not clearly waive the right to bring equitable claims, such as an entire fairness action, as a matter of law. I did so because the January 16 letter could also reasonably be read, in light of its text and particularly the Kessler Group's reservation of "all of its claims" with certain defined exceptions

arguably relating only to the formalities of the merger approval process, as merely waiving any objection to the procedures used to effect the formal approval of the merger and not any equitable claims addressing the merger's substantive fairness. I did leave open the possibility that through extrinsic evidence introduced at trial, the January 16 letter could potentially be proven to foreclose an entire fairness claim. The Broder Group, though, did not address this issue at trial or in its trial briefs in more than a cursory manner, and I therefore permit the progression of the Kessler Group's entire fairness claims.

35. Carr somehow signed this lease on behalf of Delaware III though that entity was not formed until months later. I have little doubt that, had Delaware III somehow defaulted under its lease obligations, the landlord would have had the ability to recover against Delaware Radiology directly because Carr executed the lease on behalf of Delaware III before that entity which Delaware Radiology intended to create even existed.

IV was a joint venture with Edell, who received 40% of Delaware IV.

The southern movement of the MRI Centers continued beyond Dover. In September 2004, Open MRI of Seaford, LLC ("Delaware V") was formed as the entity that would own an MRI Center in Seaford, DE. A lease for the Seaford Center was signed in February 2005, over a year after the merger. As of trial, the Seaford Center was not yet operational. The ownership structure of Delaware V is slightly different than even Delaware IV. Delaware V is owned individually by the members of the Broder Group, along with Brumberger (who is now a partner of Fox Chase), Carr, and Edell. Edell owns 40% of Delaware V, and the remaining individuals each own 8.57%.

As with Delaware I and II, payments for the read work are a substantial portion of the total revenues the Broder Group receives from its investments in Delaware III, IV, and V. In the operating agreements for those new MRI Centers, 17.5% of the total revenues were to be paid to the provider of MRI reading services. In the case of Delaware III, that provider was to be Delaware Radiology. In the case of Delaware IV and V, due to a change in Delaware law that dropped the requirement for a Delaware professional corporation to provide this type of medical service, the operating agreements provided that Fox Chase would receive the Reading Fees.

### III. *Framework For Analysis*

The resolution of this case is complicated by the presence of both an equitable entire fairness claim and a statutory appraisal claim. The key issues relevant to each type of claim are common, and the differing rubrics have relatively little influence on the bottom line outcome of the case, which turns on whether the merger was financially fair.

 Nonetheless, it is required that I address each claim on its own distinct terms. My task in addressing the appraisal aspect of the case is easy enough to state, if more difficult in practice to accomplish with any genuine sense of reliability. Put simply, I must determine the fair value of Delaware Radiology's shares on the merger date and award the Kessler Group a per share amount consistent with their pro rata share of that value, supplemented by a fair rate of interest, regardless of whether that amount is greater or less than the merger price.[36] Fair value is, by now, a jurisprudential concept that draws more from judicial writings than from the appraisal statute itself. In simple terms, to reach a fair value award, I must determine Delaware Radiology's value as a going concern on the merger date and award the Kessler Group the percentage of that value that tracks its members' pro rata interest in Delaware Radiology on that date.[37] In valuing Delaware Radiology, I may consider all relevant, nonspeculative factors bearing on its value as of the merger date.[38] That includes the input provided to me by the contending parties' experts.[39] But I cannot shirk my duty to arrive at my own independent determination of value, regardless of whether the competing experts have provided

36. *E.g., Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289, 299 (Del.1996) (hereinafter *"Technicolor"*).

37. *Andaloro v. PFPC Worldwide, Inc.,* 2005 WL 2045640, at *8 (Del.Ch. Aug.19, 2005).

38. *See Union Illinois 1995 Inv. Ltd. P'ship v. Union Fin. Group, Ltd.,* 847 A.2d 340, 356–57 (Del.Ch.2004).

39. *Technicolor,* 684 A.2d at 299 (citations omitted).

widely divergent estimates of value, while supposedly using the same well-established principles of corporate finance.[40] Such a judicial exercise, particularly insofar as it requires the valuation of a small, private company whose shares do not trade in a liquid and deep securities market, using a record shaped by adversaries whose objectives have little to do with reaching a reliable valuation, has at best the virtues of a good faith attempt at estimation. That is what I endeavor here.

■ Unlike a statutory appraisal action, the success of an equitable action premised on the assertion that a conflicted merger is unfair ultimately turns on whether the court concludes that the conflicted fiduciaries breached their duties.[41] Here, there is no question that the merger implicates the entire fairness doctrine, as the Broder Group comprised all the members of the Delaware Radiology board and the acquiring company's board, and used its majority control to vote through the merger. Nor did the Broder Group use any of the procedural devices that could temper (or in some contexts, eliminate) the application of the entire fairness standard, such as a special negotiating committee of disinterested and independent directors or a majority-of-the-minority stockholder vote provision.

■ Therefore, the Broder Group bears the burden to prove that the merger was entirely fair. That burden has been said to require that the proponents of a conflicted merger demonstrate that they proceeded in a manner that was both proce-durally and substantively fair.[42] That is more than a bit of a misnomer, as the overriding consideration is whether the substantive terms of the transaction were fair. Thus, it has been said that the two-part fairness test is not a bifurcated one; rather, all aspects of the transaction are examined as a whole in order to aid in coming to the bottom-line conclusion of whether the transaction was fair.[43] In a non-fraudulent transaction, therefore, "price may be the preponderant consideration outweighing other features of the merger." [44]

Given the nature of the merger at issue here, it makes sense to examine the process by which the merger was accomplished as an initial matter. Then, once that is examined, I will consider whether the merger was effected at a fair price, because that inquiry is common to both the entire fairness and appraisal claims.

### IV. The Fairness Of The Merger Process

■ The Kessler Group naturally alleges that the merger process was unfair because the Broder Group did not use any traditional fairness-enhancing procedures in the merger process. The most that the Broder Group did was to commission Reed to conduct a valuation of Delaware I and II so that his valuation could be used to set the price at which the Broder Group would cash-out the Kessler Group.

Unlike the Kessler Group, I am not shocked by this method of proceeding. The record is replete with futile exercises

40. Gonsalves v. Straight Arrow Publishers, 701 A.2d 357, 361–62 (Del.1997).

41. Onti, Inc. v. Integra Bank, 751 A.2d 904, 930 (Del.Ch.1999).

42. See Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del.1983).

43. Weinberger, 457 A.2d at 711.

44. Id. See also Onti, 751 A.2d at 930 n. 108 ("[W]here the claims of unfair dealing do not rise to the level of fraud ... the Court should primarily focus on whether the price was unfair.").

in negotiation between the Broder and Kessler Groups. Moreover, the Kessler Group was invited to submit information to Reed but chose not to participate in Reed's valuation exercise.

But the fact that the Broder Group decided to use its power to cash-out the Kessler Group does not mean, in itself, that it acted unfairly. Assume, for example, that the Broder Group had appointed Warren Buffett and Robert Rubin to act as a special committee, with a distinguished and unconflicted investment bank as their advisor, to value the Kessler Group's interests in Delaware Radiology as fairly as they could, based on full and fair access to company information. Assume further that the Broder Group used the resulting valuation as the basis for setting the Kessler Group's exit price. In that scenario, it would be difficult to perceive any procedural unfairness. I know of no requirement that a controller actually bargain with the minority or give a representative of the minority veto power in order to meet its burden of proving entire fairness; rather, the forsaking of such techniques is what imposes the burden of demonstrating fairness squarely on the controller. In such a circumstance, what will be determinative is whether the chosen appraiser actually came up with a fair exit price for the minority.

What is therefore critical in a case like this is whether the appraiser chosen by the Broder Group, Reed, in fact came up with a fair valuation. If Reed failed in that endeavor and the Broder Group used too low a valuation to set the merger consideration, then the Broder Group will not have met its burden to prove that the merger was fair.

Playing into this analysis are two issues that have both equitable and pure valuation implications. As the factual rendition indicates, one of the principal reasons for this dispute is the Kessler Group's objection to the Broder Group's ascending and eventual total allocation of the Reading Fees to itself, to the exclusion of the Kessler Group. In his valuation that was the premise for the merger price, Reed simply accepted that Delaware Radiology should be valued on the basis that it had to pay 17.5% of the revenues from Delaware I and 15% of the revenues from Delaware II in Reading Fees. Reed did not consider whether either the 17.5% or even the 15% fee were true market rates, given that the founders of Delaware Radiology intended to benefit not only from owning the MRI Centers but from providing the reading services. Similarly, Reed simply took it as given that the Broder Group's unilateral decision to double the management fees paid to Tri–State was a fair one, which reflected a reasonable market price for the services Tri–State provided.

■ In evaluating the fairness of the merger, therefore, it becomes essential for me to determine whether the allocation of all the reads by the Broder Group to itself was a breach of fiduciary duty or breach of contract. Even if the allocation was not in itself a breach of duty, I must determine whether the Broder Group used its control of Delaware Radiology to obtain for itself an above-market rate for the Reading Fees and for management services. These inquiries are necessary because the Kessler Group was actively disputing the Broder Group's handling of these issues as of the time of the merger. If the merger terms did not adequately account for the value of these potential claims, then the merger would not be fair. Likewise, in appraising Delaware Radiology, it is relevant to consider the value of claims belonging to the entity, as they are an asset of

the firm that is part of its value.[45]

There is another even more important issue that does not turn solely on an exercise in valuation. Reed seemed to view his task as valuing particular MRI Centers that the Broder Group brought to his attention. Consistent with that narrow prism and, as shall we see, his very incomplete understanding of the nature of Delaware Radiology, Reed did not even consider whether Delaware Radiology was more valuable as of the time of the merger because of the plans it had developed to open Delaware III and IV. His valuation included no value for those expansion plans.

The decision of the Broder Group to cash out the Kessler Group at a price that did not afford it any of the value of the gains expected from Delaware III, IV, and possibly V clearly bears on the fairness of the merger.[46] Not only that, if the concept of opening Delaware III, IV, and V was part of the business plans of Delaware Radiology as of the merger date, then the value of those expansion plans must be taken into account in valuing Delaware Radiology as a going concern, under the teaching of our Supreme Court in *Technicolor* and other precedent.[47]

■ As will be seen, after considering these issues, I determine that the Broder Group's handling of these issues fell well short of what was necessary for them to satisfy their burden of fairness. For that reason, principles of equity infuse my valuation analysis, because I have endeavored to resolve doubts, at the margins, in favor of the Kessler Group, the minority stockholders who were involuntarily squeezed out of Delaware Radiology.[48] By doing so, I attempt to come up with an award that equals what the Kessler Group would have received in a merger negotiated at arm's-length between parties with equal bargaining strength.

---

**45.** *See, e.g., Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137, 1142–44 (Del.1989); *Nagy v. Bistricer,* 770 A.2d 43, 55 (Del.Ch.2000).

**46.** *See, e.g., Onti,* 751 A.2d at 910–11 (discussing the need to include value for a company's development plans in order to prevent the majority stockholder from unfairly denying the minority any value by unfairly timing the merger); Lawrence A. Hamermesh and Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law* (U. of Penn, Inst. For Law & Econ Research, Paper No. 05–24, 2005) *available at* http://ssrn.com/abstract=810908 ("If the controller could simply choose the moment to squeeze-out the minority when the fortune of the firm was about to improve, the result would be to discourage minority shareholders from becoming minority shareholders and upset the balance that protects minority shareholders while allowing the controller to retain the benefits of control.").

**47.** *Technicolor,* 684 A.2d at 300; *see Weinberger,* 457 A.2d at 713 ("Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value."); *Onti,* 751 A.2d at 911 ("I would suggest to you that a valuation of that company as of the date of the merger that doesn't take into consideration the nonspeculative possibilities of developing this cornfield into something other than a cornfield is not a realistic valuation of the company. The minority shareholders, under those circumstances, are entitled to a valuation that reflects the value of a company that owns a cornfield that can be developed into a major office center."); *Allenson v. Midway Airlines Corp.,* 789 A.2d 572, 585 (Del.Ch. 2001) (stating that even value added by an acquiror's business plan can become cognizable in an appraisal proceeding if it is actually being implemented).

**48.** *See Andaloro,* 2005 WL 2045640, at *9.

## V. *The Fairness Of The Merger Price*

With this framework in mind, I will now resolve the key disputes over value. There are three major issues that divide the parties. The first two I will examine are the ones I have just mentioned: (1) the reading and management fee dispute and (2) the expansion plans. The other major issue involves the proper way to address the reality that Delaware Radiology was an "S" corporation before the merger [49] and that there was no likelihood that it would ever be other than an S corporation, irrespective of the merger.

These three issues account for most of the differences in value found in the reports of the testimonial experts. At trial, the Broder Group relied on the same expert it used to set the merger price in the first instance, Timothy Reed of Diversified Medical Management. Reed premised his opinion of value on a discounted cash flow analysis that attributed no value to Delaware III, IV, or V, that accepted the reading and management fees as proper expenses of the MRI Centers, and that tax affected Delaware Radiology's earnings as if it were a C, rather than S, corporation. After doing all this, and using high discount rates of 21.4% for Delaware I and 22.4% for Delaware II, Reed came to a value of $6,815,400, or $17,038.67 per share, which translated to $2,555,800 overall to the Kessler Group. This was slightly higher than the value offered to the Kessler Group in the merger, which was a value set in reliance on Reed's earlier work.

For its part, the Kessler Group employed John Mitchell of Gocial Gerstein, LLC as its valuation and damages expert. Like Reed, Mitchell relied on a DCF analysis. But Mitchell: (1) included in his valuation an estimate of the value of Delaware III and IV; (2) treated the majority of Reading Fees entirely as profit to Delaware Radiology rather than as proper expenses to the MRI Centers; (3) reduced the management fee to Tri–State, as well as the fees to Edell, as being excessive; and (4) did not tax affect Delaware Radiology's future earnings at all. Mitchell also used a lower discount rate. Using these inputs, Mitchell arrived at a value for Delaware Radiology on the merger date of $26,429,722, which translates into $66,074 per share or $9,911,100 to the Kessler Group for its 37.5% share.

In determining which side is closer to the mark, I will proceed as follows. For the sake of clarity, I begin by determining how the expansion plans affected Delaware Radiology's value on the merger date. I then address the dispute over reading and management fees. I next confront the question of whether to tax affect Delaware Radiology's earnings. Finally, I endeavor to put all the pieces together and come to a bottom-line determination of the value of Delaware Radiology as of the merger date, for the purposes of making a determination of fairness and shaping the Kessler Group's award.

### A. *Should The Value Of Delaware III, IV, And V Have Been Accounted For In The Merger Price?*

■ Delaware law is clear that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered." [50] Obviously, when a business has opened a couple of facilities

---

49. *See* 26 U.S.C.A. § 1363 (2005) ("The taxable income of an S corporation shall be computed in the same manner as in the case of an individual. . . .").

50. *Weinberger,* 457 A.2d at 713. *See also Technicolor,* 684 A.2d at 300.

and has plans to replicate those facilities as of the merger date, the value of its expansion plans must be considered in the determining fair value. To hold otherwise would be to subject our appraisal jurisprudence to just ridicule. The dangers for the minority arguably are most present when the controller knows that the firm is on the verge of break-through growth, having gotten the hang of running the first few facilities, and now being well-positioned to replicate its success at additional locations—think McDonald's or Starbucks. Here, the business plan of Delaware Radiology involved the strategy of opening additional MRI Centers in Delaware with Edell. This strategy was part of what the Supreme Court would call the "operative reality" of Delaware Radiology on the merger date and must be considered in determining fair value.[51]

▮ On this record, it is easy to conclude that the value of the expansion plans for Delaware III and IV must be considered in valuing Delaware Radiology as of the merger date. The only hard question is whether there was any non-speculative value for Delaware V as of the merger date to take into account, given the circumstances. Regrettably, the Broder Group did not content itself with fighting

about the inclusion of value for Delaware V, but rather insisted that it was perfectly appropriate to attribute no value at all to the expansion plans of Delaware Radiology as of the merger date. For that reason, I must address each of the new MRI Centers that logically arose out of Delaware Radiology's prior efforts in entering Delaware and opening Delaware I and II. Pervading this analysis is an obvious point: Delaware I through V are all premised on the same model of operation and all involve a partnership with Edell, whereby he will stimulate client flow and the stockholders of Delaware Radiology will bring their radiology expertise to bear, in order to run profitable MRI Centers in State of Delaware on a consistent model.

### 1. *Delaware III*

▮ As was detailed earlier, Delaware Radiology began considering the possibility of opening a third MRI Center in Middletown at least as early as June 2002.[52] At a board meeting in May 2003, after the Groups were feuding, the Delaware Radiology board approved proceeding with Delaware III. In July 2003, a location in Middletown was found and Delaware III, which was not even formed yet, entered into a commercial lease. The Delaware

---

**51.** In essence, when the court determines that the company's business plan as of the merger included specific expansion plans or changes in strategy, those are corporate opportunities that must be considered part of the firm's value. *See Technicolor*, 684 A.2d at 298–99 (discussing that the company's value should take into account the new strategy implemented by a majority shareholder before the minority was cashed-out). *See also Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 222 (Del.2005). As a thoughtful academic paper notes, there is an obvious relation between the need to evaluate what the business plans of the company being valued in appraisal were as of the merger date, and the equitable corporate opportunity doctrine. *See generally* Hamermesh and Wacht-

er, *The Fair Value of Cornfields in Delaware Appraisal Law*. Conceived this way, the court's task in appraisal incorporates the equitable concerns traditionally policed by the corporate opportunity doctrine. Indeed, the Supreme Court previously has held that corporate opportunity claims can be valued in the context of an appraisal action. *See Cavalier Oil*, 564 A.2d 1137. The Chancellor's decision in *Onti v. Integra* illustrates well the interaction of these concerns. In that case, the Chancellor took into account a corporation's similar plans to expand in shaping his remedy in a combined appraisal/entire fairness proceeding. *Onti*, 751 A.2d at 925–26.

**52.** Tr. 399.

III entity was formed in December 2003, which was before the merger. The MRI magnet for Delaware III was leased on January 9, 2004. All of these events occurred before the January 20, 2004 merger.

Similarly, Delaware Radiology paid Tri–State management fees that were, in part, to compensate Tri–State for business development, including "[evaluating] potential growth sites within current markets" and "[negotiating] possible facility leases."[53] Carr spent considerable time working on Delaware III, consistent with the fees Tri–State was being paid. What is inconsistent and unfair is the Broder Group's insistence that his work on Delaware III, which bore fruit, did not produce value that was part of Delaware Radiology's worth as a going concern on the merger date.

For all these reasons, it is abundantly clear that the plans for Delaware III were part of the operative reality that was Delaware Radiology as of the merger date.

██ The best that the Broder Group can do to defend against the obvious fact that the Delaware III opportunity was Delaware Radiology's is to advance hearsay testimony from Broder and Carr that Edell was supposedly unwilling to go forward with other MRI Centers until Delaware Radiology's owners ended their feud.[54] Frankly, I do not credit that self-serving testimony. Edell lives in Delaware and knows where King Street is. Edell did not testify at trial or in deposition. He has long-standing relations with members of the Kessler Group, closer it appears than his relations with the Broder Group. If Edell had come to court and said that he only wanted to work with the Broder Group, the Broder Group's argument would have had some force. The testimony of Broder and Carr is no substitute for such a clear expression by Edell himself.

What is likely is that Edell was sick of the jejune jousting of his business partners and did not want to be caught between the competing Groups. That understandable sentiment is no safe harbor for the Broder Group to attribute no value to the expansion plans. No doubt Edell would have been equally as happy or even happier to work with Delaware Radiology if the Kessler Group was in charge of it. Likewise, Edell would have been more than happy to work with Delaware Radiology if the Groups healed their relationship. Edell just wanted to make money and not become enmeshed in disputes within the community of healers.

If that was Edell's sentiment, that reality did not grant the Broder Group a license to squeeze-out the minority and usurp all of the value of the expansion plans for itself. The expansion plans for Delaware III were clearly part of the operative reality of Delaware Radiology as of the merger date and under *Technicolor* and its progeny must be valued in the appraisal.[55] Although the Broder Group could use the brute power of its majority block to control Delaware Radiology and its opportunities on a future basis, the price of that exercise of clout is the allocation to the minority of its fair share of all the expected gains from the company's business plans. The majority cannot justify its usurpation of those plans by reference to an unresolved dispute with the minority.[56]

53. Jt. Ex. 272.

54. Tr. 133–35.

55. *See Technicolor,* 684 A.2d at 297.

56. *See Onti,* 751 A.2d at 910–11 (stating that minority shareholders could not be deprived of the development value of undeveloped "cornfields" in a cash-out merger based on

It is undisputed that the Broder Group accorded no value to Delaware III in setting the merger terms. That was unfair and resulted in an undervaluation of Delaware Radiology. Even at trial, when faced with the possibility that the court would say that the value of Delaware III had to considered, the Broder Group presented no helpful evidence. Despite the fact that projections for Delaware III had been presented to federally-regulated financial institutions for financing purposes[57] and, even more importantly, that Delaware III represented an extension of a business model that Delaware Radiology already had used successfully twice, the Broder Group's expert Reed testified that it was his "fundamental belief that the projections [for Delaware III] were not relevant for an entity that had not yet opened."[58] In fact, he stated that "it never really even occurred to [him] that there was any value there at all."[59] If that is true, Reed has a jarringly novel view of corporate finance, in which the value of McDonald's does not include the revenues it expects to make from the new franchises it will open.

### 2. *Delaware IV*

▆▆▆▆ The analysis regarding Delaware IV is similar. Delaware IV was formed as a Delaware limited liability company on January 12, 2004—eight days before the merger. Its location in Dover was leased on January 27, 2004—seven days after the merger—and the terms of the lease were finalized before the merger but simply not executed. Of course, the Broder Group was careful to invest in Delaware IV through an entity other than Delaware Radiology for tactical reasons, but that conduct actually tends to prove rather than refute the Kessler Group's argument. That is, the use of an alternate vehicle was designed to facilitate the Broder Group's desire to accord the Kessler Group no value for the Delaware IV opportunity in the merger price. Put bluntly, that desire is evidence of substantive unfairness, as it meant that the merger price did not include the complete value of Delaware Radiology's business opportunities.

▆▆▆▆ Delaware IV was an obvious southward expansion for Delaware Radiology and Edell, which built off their prior plans. Put in traditional corporate opportunity terms, Delaware IV was an opportunity that was: (1) in the line of the corporation's business and is of practical advantage to it; (2) within the corporation's financial ability to capture; and (3) one in which the corporation has an interest or a reasonable expectancy.[60]

the majority shareholder's argument that a transaction would not occur without cashing out the minority).

**57.** By federal statute, it is a felony to knowingly obtain any funds from a financial institution by false or fraudulent pretenses or representations. 18 U.S.C.A. § 1344 (2006).

**58.** Tr. 494.

**59.** *Id.* at 516.

**60.** *Guth v. Loft,* 5 A.2d 503, 511 (Del.1939). These requirements have been restated and discussed numerous times. *See, e.g., Broz v. Cellular Info. Sys., Inc.,* 673 A.2d 148 (Del. 1996); *Kaplan v. Fenton,* 278 A.2d 834 (Del. 1971); *Equity Corp. v. Milton,* 221 A.2d 494 (Del.1966); *In re eBay, Inc. S'holders Litig.,* 2004 WL 253521 (Del.Ch. Feb. 11, 2004); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 833 A.2d 961 (Del.Ch. 2003); *see also* R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 4.36 (3d ed.2006). The Kessler Group, of course, lost standing to bring a corporate opportunity claim on behalf of Delaware Radiology when the merger became effective, but this derivative corporate opportunity claim can be valued in an appraisal action. *See Kohls v. Duthie,* 765 A.2d 1274 (Del.Ch.2000). Moreover, the Broder Group's failure to value expected cash flows from expansion is a proper challenge in this

The planning for Delaware IV was simply a continuation of the hope of Delaware Radiology and Edell to fill out a statewide network of MRI Centers. Carr was paid by Delaware Radiology for business development work and performed much of the legwork for Delaware IV before the merger.[61] For all these reasons, I have little difficulty concluding that the plans for Delaware IV constituted part of the operative reality of Delaware Radiology as of the date of the merger. There was nothing speculative about the plans to open an additional MRI Center in Dover using the proven model, and the Broder Group's refusal to include in the merger price any value attributable to Delaware IV was unfair.

### 3. Delaware V

The harder question that arises relates to Delaware V, which was created at a time more remote from the merger. Delaware V is the Seaford MRI Center that the Broder Group has opened with Edell, using the same model as Delaware I and II. The Delaware V entity was not formed until September 15, 2004. The financing needed for Delaware V to progress was not secured until late October 2004,[62] the lease was not entered into for a location in Seaford until February 9, 2005,[63] and the Delaware V facility did not open until January 2006, after trial in this matter was over.[64]

■ The reason I find this issue difficult has less to do with when Delaware V actually began to operate than with the question of when the idea of opening another MRI Center in Delaware began. Al-

though Carr denies that he had begun formulating plans for a Sussex County MRI Center before the merger, I do not find that testimony credible. Carr's trial testimony was more redolent of total loyalty to the Broder Group, with whom his financial interests are aligned, than of a careful attempt to be as accurate as possible.

■ In this respect, it would ordinarily be comforting to me that the paper record is devoid of evidence that the Broder Group was planning for a Sussex County facility before the merger. But the reality is that the Broder Group resisted discovery into the planning for Delaware III and IV deep into the litigation, and the Kessler Group has raised non-frivolous arguments regarding the absence of production of documents relating to the formation of Delaware V. In the equitable part of this case, the Broder Group bears the burden of showing that its actions are entirely fair. Given its failure to accord any weight to the value of even Delaware III in setting the merger price, the Broder Group's less than forthcoming attitude about the production of evidence regarding Delaware V is disturbing. The Broder Group should have embraced the opportunity to convince me that Delaware V was an initiative completely distinct from Delaware Radiology's previous strategy. It did not but instead left me harboring serious doubts about the bona fides of its document production.

■ As or more important are the objective business circumstances. The procession of the MRI Centers southward to encompass the entirety of Delaware is, it seems to me, not at all coincidental. By

case to the fairness of the merger itself as that omission is alleged to have materially tainted the merger price. *See Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245–47 (Del.1999).

**61.** Jt. Ex. 272.

**62.** Tr. at 418.

**63.** Jt. Ex. 261.

**64.** Tr. 418.

this method, Delaware Radiology and Edell can replicate the successful Delaware I and II model on a statewide basis. In doing so, they are able to capture economies of scale and capitalize on their prior work. To that point, I would note that the operating agreement for Delaware V looks much like that for Delaware I and II. Equally likely is that the Broder Group and Edell were able to obtain much easier access to health insurance and health maintenance organization provider networks for Delaware V precisely because they had already established Delaware I, II, III, and then IV as network providers. Delaware V could then be pitched as an extension and build off the prior contractual relationships.

Stated directly, the creation of Delaware V simply finished off the obvious strategy of creating a statewide network of MRI Centers. That the ultimate success of that strategy was not assured when Delaware Radiology was first formed, or is even guaranteed now, is not the determinative issue. The gravitational direction of Delaware Radiology toward statewide expansion has been clear from the beginning, and is made even more obvious by the business expansion duties given to Tri–State. To keep with the prior analogy, assume that the Broder Group was the majority stockholder of an entity that had the first McDonald's franchise in Delaware and the right to open the rest as the brand expanded statewide. If it squeezed out the minority, the value would have had to recognize the company's plans to go statewide.

This case presents the same situation. Delaware V is the natural culmination of the Delaware Radiology–Edell business strategy, a strategy that was in active implementation before the merger. Al-

though the plans for a Sussex County MRI Center were more inchoate than the plans for the Middletown and Kent County Centers, I believe that the goal of a Sussex County Center was established before the merger. The greater uncertainty about when a Sussex County Center would open and its value will be taken into account when shaping the award, but I believe it requires that some value be attributed, to address the Broder Group's decision to usurp for itself the exclusive right to control the statewide network for itself.

B. *Is Each Shareholder Entitled To A Share Of The Reading Fees Proportionate To His Ownership Interest In Delaware Radiology?*

Because the members of the Broder and Kessler Groups are all radiologists, it is not surprising that the allocation of read work from the MRI Centers was a major issue at trial. Both sides took positions that did not have the ring of truth.

For its part, the Kessler Group claimed that there had been an agreement among the original stockholders of Delaware Radiology that entitled them to receive read work, and the corresponding reading fees, in proportion to their stock ownership in Delaware Radiology. To buttress this argument, the Kessler Group cites to a provision in the operating agreements for Delaware I and II that gives Delaware Radiology the exclusive right to perform the MRI reads for fifteen years.[65] In addition, § 2.1.4 of the Professional Services Agreement between Delaware Radiology and Delaware I states that Delaware Radiology is "solely responsible for the MRI Diagnostic Radiology Services rendered by it or its radiologist employees." [66]

---

**65.** *See* Jt. Ex. 6 at § 6.3; Jt. Ex. 21 at § 6.3. **66.** Jt. Ex. 7.

The problem for the Kessler Group is that Delaware Radiology never provided any radiology services for patients at Delaware I and II. Rather, from the get-go, Delaware Radiology farmed out the read work to Fox Chase. As an attorney for the Kessler Group described it:

> Notwithstanding that JRA, Fox Chase Radiology, and Delaware Radiology have provider agreements relating to various facilities, it appears that all of the net income from physician services at all of the facilities is funneled into Fox Chase Radiology which appears further to distribute all of its net income ... among the Shareholders pursuant to their respective employment agreements. While this arrangement appears to be undocumented, it appears to be based upon a mutual agreement and understanding among the Shareholders. . . . [67]

At trial, Shaer testified that he knew "[Delaware Radiology] itself would not do the reads." [68] Shaer and the other members of the Kessler Group were complicit in that strategy and cannot complain now that Delaware Radiology is not providing the read services itself.[69]

The arrangement whereby Delaware Radiology would contract out its right to perform the read work is not at all surprising. Delaware Radiology was the Delaware-based entity that the partners at Fox Chase set up to enter the Delaware market and to meet the regulatory requirements necessary for practice. One of those requirements was that Reading Fees be paid to a Delaware entity in the first instance. When Delaware I and II were opened, Delaware Radiology shareholders were all partners in Fox Chase. Thus, Delaware Radiology's reliance upon Fox Chase to do the read work did not cause any economic controversy, as that arrangement essentially resulted in pro rata treatment of the Delaware Radiology stockholders through their distributions from Fox Chase.

It was only after the Kessler Group left Fox Chase and the Broder Group acted to reduce the Kessler Group's share of the read work from Delaware I and II to one-sixth and then zero that the pro rata argument arose. The Kessler Group believed that it was being cut out of one of the primary economic justifications for the formation of Delaware Radiology. Its argument that read work was supposed to be distributed pro rata to stockholder holdings is a manifestation of their belief that they were being treated unfairly.

But that precise argument lacks merit. As was discussed previously, the read work was never allocated to each stockholder personally in proportion to his or her ownership interest. Indeed, not all the Delaware Radiology stockholders were or are even qualified to do the read work. And the so-called Kessler Group did not even exist as a group as of the formation of Delaware Radiology. Thus, before the Kessler Group left Fox Chase, Delaware Radiology passed on all the read work to Fox Chase, where three of the radiologists

---

67. Jt. Ex. 19 at 3.

68. Tr. 707.

69. *Cf. Balin v. Amerimar Realty Co.,* 1996 WL 684377, at *19 (Del.Ch. Nov. 15, 1996) ("Balin asserts that because the Master Agreement is now the definitive governing document, the Denver fees must flow directly to Amerimar Realty. The fatal infirmity in this argument is that Balin never put the Master Agreement into effect. Instead, he disregarded that agreement and acquiesced in the quite different present fee flow structure. . . . Having disregarded ... the Master Agreement, Balin cannot now be permitted to resurrect it and then attack the very fee structure in which he has acquiesced.").

did the work, and all of the Delaware Radiology stockholders benefited pursuant to the Fox Chase partnership arrangements.[70]

■ After the Kessler Group opened Bucks County, it received a disproportionate share of the read work, because it had two of the three MRI readers.[71] As Fox Chase gained additional capacity, it is clear that the Broder Group sought to capture as much of the read work for itself as it could, as is reflected in the steadily decreasing share of the work it allocated to the Kessler Group. Once the Jeanes Hospital contract issue arose, the Broder Group sought to eliminate the Kessler Group's role in read work altogether. From this history, it is impossible to conclude that there was a specific agreement for pro rata allocation of the read work.

But contrary to the Broder Group's hopes, that does not mean that the Kessler Group's claim of unfairness has no force at all. Rather, when properly conceptualized, that claim is meritorious.

Delaware Radiology secured a valuable right in its negotiations with Edell over the MRI Centers. It was the managing partner for the MRI Centers and could direct the read work. The original 15% fee it negotiated with Edell was a healthy one that was intended to allow the provider of the read work to reap healthy gains from doing the reads. For his part, Edell was granted a 5% fee for his marketing work at Delaware I and 7.5% for his marketing work at Delaware II.

So long as the Delaware Radiology board was dealing with its right to receive the Reading Fees in a manner that was fair to all of its stockholders, it did not need to consider whether passing on the entire 15% fee was fair to Delaware Radiology as an entity. If the pass-through worked roughly pro rata treatment, then the stockholders' legitimate interests were protected.

The problem arose when the Broder Group began to use its majority control of Delaware Radiology to advance its own interests. As Broder was honest to admit at trial, after the Kessler Group left Fox Chase, Broder wanted Fox Chase to do all the read work and for the Kessler Group to do none of it.[72] By no later than December 2002, Broder had fully implemented that desire.

■ As a matter of majority control, there is nothing intrinsically wrong with the Broder Group's decision to cut the Kessler Group out of the read work. But the Broder Group could not arrogate all the reads to itself unless it did so in a manner that was entirely fair to Delaware Radiology. And that is where it fell far short of the mark.

The Broder Group failed to demonstrate at trial that the 15% rate that was originally used was a market rate. More likely is that it was a rate that allowed the founders, all of whom were partners at Fox Chase, to make a very nice profit from doing read work for the MRI Centers. After all, the desire to guarantee a profitable flow of captive work was a primary purpose behind the creation of Delaware Radiology. Even less debatable is that the 17.5% rate that the Broder Group charged Delaware III and IV pursuant to their operating agreements and charged Delaware I as of March 2003 was not a market rate. It was simply a profit-sharing arrangement with Edell, who was granted an

---

70. Tr. 46–47.

71. *Id.* at 841–82.

72. Tr. 203–04.

increase in his Delaware I marketing fees from 5% to 7.5% at the same meeting.

By the end of 2002, the Broder Group had assumed firm and exclusive control of the Delaware Radiology board. Rather than consider any other providers of read work, the Broder Group simply chose to allocate as much of the read work as it could to Fox Chase at a price that was higher than Delaware Radiology could have secured after a market check. The record leaves me no doubt that the Broder Group saw no reason for it to look for other sources or to examine the price of the services rendered; it viewed the Kessler Group members as defectors whose voluntary decision to leave Fox Chase left them in no equitable position to complain. In Broder's view, the Kessler Group cut itself out—had its members stayed at Fox Chase, they would still have been sharing in the read revenues, as they had when Delaware I and II were first formed.

Broder's very human reaction, however, is inconsistent with fiduciary principles. Just as there was no contractual obligation for the Delaware Radiology to pass the benefits of the read work to its stockholders on a pro rata basis, there was no contractual obligation for stockholders of Delaware Radiology to remain as partners in Fox Chase. The Kessler Group's decision to leave Fox Chase did not grant the Broder Group a license to profit at the expense of Delaware Radiology as an entity, but that is what the Broder Group did.[73]

Although the record on this point is not as clear as I would like, I am convinced that Delaware Radiology could obtain a provider of reading services of a quality equal to Fox Chase for a rate lower than 15% and certainly for a rate lower than 17.5%. In so concluding, I want to make the point about equal quality absolutely clear. The Kessler Group pointed to what I would call "bargain-basement" options of contracting work out to radiologists who work at their homes, reading MRIs from home computers, in isolation from other practitioners. I do not premise my ruling on that type of service. As the board majority, the Broder Group was within its legitimate rights to seek to provide patients at the MRI Centers with high-quality read services from radiologists practicing in a group, who could, in debatable situations, call on colleagues to help provide the most accurate diagnosis possible. The Broder Group could also decide to provide those services itself, so long as it did so at a fair market rate.

At trial, the Broder Group put on anecdotal evidence suggesting that a fee of 15–20% of an MRI Center's revenues was a fair fee for reading work. That evidence was flimsy and insubstantial, lacking any reliable basis in actual contracts for comparable work or empirical surveys of market rates for reading work. In this context—where the Broder Group has allocated valuable read work to itself without a market check—it bears the burden of showing that it was receiving a rate fair to Delaware Radiology. The Broder Group has fallen well short of the mark. It has left me with the firm impression that the original 15% rate had a healthy profit margin in it for the read provider and did not reflect the rate that Delaware I and II could have secured after a real market check. The 17.5% rate now at

---

**73.** *Cf. Telxon Corp. v. Meyerson,* 802 A.2d 257, 265 (Del.2002) ("Like any other interested transaction, directorial self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation.").

Delaware I, III, and IV is even more plush from the reader's perspective.

In coming to that conclusion, I consider a few important factors. Initially, I note that one of the reasons Delaware Radiology was formed was to give the founding radiologists a more certain source of work in a competitive market in which margins were being squeezed. The margin pressure, as of the merger date, was increasing. This was illustrated by the competition between the Broder and Kessler Groups for the Jeanes Hospital contract, as well as the emerging trend of offshoring radiology work. In that latter respect, the reality that radiologists can read most MRI scans from remote computer terminals meant that margins were not likely to widen and that competitive pressures would increase. Although I do not adopt the Kessler Group's view that the Delaware Radiology had to seek a bargain-basement price, I do credit the testimony it put on that qualified radiology reads from a practice group similar in quality to the Broder Group could be procured for rates far less than the 15% rate originally secured for Delaware Radiology.[74] Clinching my conclusion is the Broder Group's own behavior. By formulating and acting on a plan to take *all* of the read work for Fox Chase, the Broder Group's conduct demonstrates their belief that this work is very profitable to the readers.

■ The difficult question in the end is really one of measurement: how big is the gap between a fair market rate and the 15% and 17.5% rates that Delaware Radiology was paying to the Broder Group as of the merger? In a regrettably fulsome record, there is only one piece of genuinely reliable evidence on this important topic. At trial, the Broder Group provided a detailed breakdown of the current Medicare reimbursement rate for MRI professional services, which is equivalent to a 13.7% fee.[75] Although one cannot be certain that it would have cost Delaware Radiology somewhat more or less than the Medicare rate to obtain reading services equivalent in quality to that provided by the Broder Group as of the merger, that uncertainty results from the Broder Group's decision not to do a market check and to allocate all the read work to its Fox Chase entity, using its majority power. By using the objective Medicare rate, I base my award on the most reliable evidence of a market rate in the record, which is premised on what is paid by one of the most important market payers in American health care.

■ I factor that rate into my award in the following manner. I assume for purposes of my valuation of Delaware Radiology as of the merger date that it could have obtained read services for 13.7%, leaving the difference between the 17.5% it received from Delaware I, III, and IV, and the 15% it received from Delaware II, and that figure as profit that would be available to Delaware Radiology as an entity. That is, the 3.8% difference at Delaware I, III, and IV and the 1.3% difference at Delaware II is what I find to be the unfair profit the Broder Group diverted from Delaware Radiology to itself, so that amount

---

74. In fact, leading up to this litigation (and no doubt for the purpose of this litigation) the Kessler Group offered to perform the read work at a lower rate. Jt. Ex. 183. Shaer testified that the Kessler Group's best contract rate for performing reads was $72.50 per read, which, based on the reimbursement rate for Delaware I and II, would be a fee of approximately 12%. In addition, the Kessler Group discusses certain reading rates, which start around $45 per read, it pays to contract readers.

75. Rebuttal Report of Reed Ex. A (hereinafter "Reed Rebuttal").

will be returned to the value of Delaware Radiology.

■ This conclusion involves me including my estimate of the value of Delaware Radiology's claims against the Broder Group in the fair value of the Delaware Radiology on the merger date. Because the overage paid to the Broder Group in excess of market reduced the balance sheet profitability of Delaware Radiology, the claim belonged to Delaware Radiology and was surfaced by the Kessler Group as a derivative claim. Whether as a matter of appraisal or a fairness challenge to the merger, the overage is relevant to determining whether the Kessler Group was treated fairly in the merger.

D. *Are The Management Fees Paid To Tri–State And Edell Fair To The Minority Shareholders Of Delaware Radiology?*

There are two other points of contention between the Broder and Kessler Groups about alleged self-dealing. These points involve whether the management fees paid to Tri–State, a wholly-owned Broder entity, and to Edell, the influential Delaware physician whose marketing efforts were critical to the success of the MRI Centers, were fair to Delaware Radiology. The Kessler Group argues that the fees of 2% and 7.5% of revenues to Tri–State and Edell, respectively, constitute excessive payments resulting from log-rolling between Edell and the Broder Group. The Broder Group contends they are reasonable and fair rates that reflect the important managerial and marketing tasks performed by Edell and Tri–State on behalf of the MRI Centers.

The magnitude of the dispute is actually rather confined. The Kessler Group does not challenge Edell's entire cut, simply that above 5%. Moreover, Tri–State's take is only 2% at maximum and is therefore not very material to the overall valuation determination. But money is money, and the dispute must be decided. I will do so tersely.

■ As to Tri–State, there is no evidence that it does not perform its duties competently. Although I found the testimony of its principal, Carr, to be more redolent of an overly zealous advocate for his bosses, the Broder Group, than of the core truth, there is nothing in the record to suggest that he is not a competent administrator of the MRI Centers. Before Tri–State's involvement in 2001, the MRI Centers were managed by the doctors themselves, and Carr's involvement took those duties off their hands. Tri–State was retained while the Kessler Group was still on the board of Delaware Radiology and Shaer of the Kessler Group was its President. The 1% management fee payable to Tri–State was proposed by Broder in a memorandum to Edell.[76] At trial, Shaer testified that "[i]n terms of management, while I was intimately involved in the operations of Delaware, at some point, Tri–State began receiving one percent of collections for management."[77] Additionally, Shaer indicated that he spoke with the other members of the Kessler Group and communicated to the Broder Group that Carr, while an employee of Fox Chase, was "doing a pretty good job with the centers ... and we should go forward with him."[78] Further, Shaer said that the memorandum informing Edell of the 1% management fee was something "that collectively, the board or ... the sharehold-

**76.** Jt. Ex. 37.

**77.** Tr. 838.

**78.** *Id.* at 738.

ers had decided would be implemented at Delaware Open MRI" and the Kessler Group was apprised that "the Broder group were the shareholders in Tri–State." [79] There is no rational basis, therefore, to question the 1% fee to Tri–State, given that it was approved by the Kessler Group on full information.[80]

 The problem is that the fee for Tri–State changed. In 2003, after the Broder Group booted the Kessler Group off the board and out of management, the Broder Group raised the management fee payable to Tri–State, its wholly-owned entity, to 2%. This was an interested transaction that was not ratified or acquiesced to by the Kessler Group, and the business judgment rule does not apply when a decision is made "by a board a majority of whom have a material conflict of interest in the transaction." [81] The Broder Group introduced no reliable evidence indicating the fairness of this increase to the Kessler Group, and I, therefore, will reduce the management fee to the 1% previously agreed upon. In reaching this determination, I am also mindful of the behavior of the Broder Group during this period relating to the read work—behavior that evinces a desire to capture as much of the profit of Delaware Radiology as possible for itself, to the exclusion of the Kessler Group.

 The issue involving Edell is a little more subtle.[82] In essence, the Kessler Group argues that Edell exploited the rift between the Broder and Kessler Groups to get a bigger cut for himself in March 2003. In exchange for accommodating the Broder Group's desire for a higher percentage for Reading Fees and for Tri–State, Edell simultaneously extracted an increase to 7.5% for his cut of Delaware I.[83] In fact, at the same March 2003 meeting when these changes were made, the billing services work for the MRI Centers was transferred from an independent entity that received 3% of revenues to an entity controlled by the Broder Group at the same rate.[84] The smell of a deal remains pungent.[85]

Even so, I do not believe that there is a reasonable basis to question the fairness of what Edell extracted. At trial, the Broder and Kessler Groups agreed that Edell's involvement was a boon to Delaware Radiology because both perceived him as having a uniquely valuable relationship with Delaware's community of physicians, which enabled him to generate referrals for the MRI Centers, thereby ensuring their success. In addressing Edell's demands, the Broder Group had an incentive to keep his share down while balancing the need to

**79.** *Id.* at 738–41.

**80.** *E.g., In re Cox Comm'n, Inc. S'holders Litig.,* 879 A.2d 604, 615 (Del.Ch.2005) (recognizing that Delaware law typically "gives ratification effect to approval of the interested transaction by a majority of the disinterested stockholders.").

**81.** *E.g., Ryan v. Tad's Enters.,* 709 A.2d 682, 689 (Del.Ch.1996), *aff'd,* 693 A.2d 1082 (Del. 1997).

**82.** Ordinarily, as the directors of Delaware Radiology from the Broder Group would not receive any benefit from an increase in Edell's fees, their decision would be subject to the protection of the business judgment rule.

**83.** As was mentioned, Edell already was entitled to 7.5% of the revenues from Delaware II. He had been receiving that cut since it began operating in 1999.

**84.** Jt. Ex. 79.

**85.** *Ryan,* 709 A.2d at 689–90 (indicating that when a controlling shareholder provides a benefit to a third party in order only to secure a benefit for itself, or has a material interest in the transaction, that decision is not protected by the business judgment rule).

retain his commitment to the success of the MRI Centers. From what I heard from both groups at trial, the 7.5% fee to Edell was well justified by the marketing and development work he did. Moreover, having redressed the Broder Group's extraction of value, at the expense of the Kessler Group, through increased payments to Fox Chase for read work and to Tri–State for management, I have ensured that the Broder Group did not extract any unfair value from its bargaining with Edell. The reduction of the read work percentage to 13.7% and the management fee to 1% in valuing Delaware Radiology accomplishes that result. In other words, I have addressed the "interested" side of the dealings between the Broder Group and Edell directly and do not believe that the record warrants going further.

### E. *Is It Appropriate To Tax Affect The Earnings Of Delaware Radiology In Order To Determine Its Fair Value?*

The proper manner to tax affect the earnings of Delaware Radiology is the next major issue that must be addressed. The Broder Group's expert, Reed, treated Delaware Radiology as if it were a "subchapter C" corporation[86] when he performed the valuation that the Broder Group used to set the merger price. Reed stuck by this approach at trial. To be specific about Reed's methodology, he made the standard move of applying a 40% tax to Delaware Radiology's earnings, the com-

mon estimate of federal and state income taxes used in valuing a C corporation.

By contrast, the Kessler Group's expert, Mitchell, asserted the proposition that because Delaware Radiology was an S corporation, it faced no corporate-level income taxes. Relying on this as Delaware Radiology's operative reality, Mitchell did not tax affect its earnings in performing his valuation. Any taxes, Mitchell reasoned, would be paid at the stockholder level and should not be considered in valuing Delaware Radiology as an entity.

This dispute raises an interesting question of valuation, which has elicited a fair amount of attention from judges, appraisers, and academics.[87] After careful consideration, I conclude that neither of the experts has taken the most reasonable approach to valuing Delaware Radiology.

The problem with Reed's approach of treating Delaware Radiology as a C corporation is obvious. Delaware Radiology is a very small entity. The record reveals no set of circumstances in which it is likely that Delaware Radiology will convert to C corporation status. It is a highly profitable entity that generates and distributes income well in excess of the stockholder level taxes its stockholders must pay. The S corporation tax status is a highly valuable attribute to the shareholders of Delaware Radiology, given its profitability and the affluent status of its physician stockholders, who face top marginal tax rates.

---

**86.** *See* 26 U.S.C.A. § 301 *et. seq.* (2005) (Subchapter C dealing with corporate taxation issues).

**87.** *See, e.g., In re Radiology Assocs.*, 611 A.2d 485 (Del.Ch.1991); *Estate of Adams v. Commissioner of Internal Revenue*, 2002 WL 467235 (U.S.Tax Ct. Mar. 28, 2002); *Heck v. Commissioner of Internal Revenue*, 2002 WL 180879 (U.S.Tax Ct. Feb. 5, 2002); *Gross v. Commissioner of Internal Revenue*, 1999 WL

549463 (U.S.Tax Ct. July 29, 1999); Franklin M. Fisher et. al., *The Sale of the Washington Redskins: Discounted Cash Flow Valuation of S–Corporations, Treatment of Personal Taxes, and Implications for Litigation*, 10 Stan. J.L. Bus. & Fin. 18 (2005) (hereinafter "Fisher"); Z. Christopher Mercer, *S Corporation Valuation Issues*, The American Society of Appraiser's 22nd Annual Business Valuation Conference (Oct. 17, 2003) (hereinafter "Mercer").

Under Delaware law, an appraisal petitioner is "entitled to be paid for that which has been taken from him...."[88] In this case, the Kessler Group was involuntarily deprived of the benefits of continuing as stockholders in a profitable S corporation—benefits that were comprised materially of the favorable tax treatment that accompanies S corporation status. As a matter of fairness, the merger price had to take into account these benefits and provide fair compensation for the Kessler Group's loss. Reed's approach denied the Kessler Group members the value they would have received as continuing S corporation stockholders in Delaware Radiology and, therefore, ensured that the merger price was lower than fair value.

■ At the same time, Mitchell's approach is equally flawed and overstates the value fairly belonging to the Kessler Group. The value of the S corporation structure is one that is experienced at the stockholder level and that is easy to overstate. If an S corporation is to be sold, for example, it will receive no premium over a C corporation if the universe of buyers is principally comprised of C corporations.[89] There is an obvious reason for this: unless the buyer of the S corporation can retain and benefit from that tax status, then the buyer will value an S corporation at the value it would have as a C corporation. Therefore, it would be highly misleading to do a market-based comparable acquisition valuation of an S corporation using sales of comparable C corporations to C corporations, and then assume that the S corporation would be sold at a higher price because of its tax status. In other words, I am not trying to quantify the value at which Delaware Radiology would sell to a

C corporation; I am trying to quantify the value of Delaware Radiology as a going concern with an S corporation structure and award the Kessler Group their pro rata share of that value.

In this case, then, the more relevant problem with Mitchell's approach is that his failure to tax affect Delaware Radiology's earnings at all results in an artificial inflation of the value of S corporation status to the Kessler Group. To capture the precise advantage of the S corporation structure to the Kessler Group, it is necessary to use a method that considers the difference between the value that a stockholder of Delaware Radiology would receive in Delaware Radiology as a C corporation and the value that a stockholder would receive in Delaware Radiology as an S corporation. By using that method, I can make my best estimate of the value that is relevant in this case—the going concern value in an S corporation that was taken from the Kessler Group in the merger.

■ In undertaking this analysis, I embrace the reasoning of prior decisional law that has recognized that an S corporation structure can produce a material increase in economic value for a stockholder and should be given weight in a proper valuation of the stockholder's interest.[90] That reasoning undergirds not only holdings of the *Adams, Heck,* and *Gross* cases in the U.S. Tax Court, but an appraisal decision of this court, which coincidentally also involved a radiology business.[91] The opinion in *In re Radiology Associates* noted that "under an earnings valuation analysis, what is important to an investor is

88. *Tri–Continental Corp. v. Battye,* 74 A.2d 71, 72 (Del.1950).

89. *See* Mercer 9–14.

90. *See Adams,* 2002 WL 467235; *Heck,* 2002 WL 180879; *Gross,* 1999 WL 549463.

91. *In re Radiology Assocs.,* 611 A.2d at 495.

what the investor ultimately can keep in his pocket."[92] In that case, on the record before it, the court held that the way to implement that insight was to ignore tax completely.[93] The *In Re Radiology Associates* decision comported with decisions of the U.S. Tax Court, which has given life to the advantages of S corporation status by refusing to tax affect the corporation's earnings at all.[94]

My difference with these prior decisions is at the level of implementation, rather than at the level of principle. Certainly, in this context when minority stockholders have been forcibly denied the future benefits of S corporation status, they should receive compensation for those expected benefits and not an artificially discounted value that disregards the favorable tax treatment available to them. But the minority should not receive more than a fair S corporation valuation. Refusing to tax affect at all produces such a windfall, as I next explain.

The Internal Revenue Code states that "[t]he taxable income of an S corporation shall be computed in the same manner as in the case of an individual...."[95] This tax, though assessed at individual rather than corporate tax rates, is dependent solely upon the corporation's net earnings. Even if Delaware Radiology were to retain 100% of its earnings annually, its stockholders still would owe taxes on Delaware

Radiology's income even though they received no distributions. Affording a remedy to the Kessler Group that denies the reality that each shareholder owes taxes on his proportional interest in Delaware Radiology would result in the Kessler Group receiving a higher per share value from the court than it could ever have realized as a continuing shareholder.[96]

The amount that should be the basis for an appraisal or entire fairness award is the amount that estimates the company's value to the Kessler Group as S corporation stockholders paying individual income taxes at the highest rates—an amount that is materially more in this case than if Delaware Radiology was a C corporation. In coming to a determination of how the Kessler Group's interest in Delaware Radiology would be valued in a free market comprised of willing buyers and sellers of S corporations, acting without compulsion, it is essential to quantify the actual benefits of the S corporation status. That is also essential in order to determine the value of what was actually taken from the Kessler Group as continuing stockholders.

Assessing corporate taxes to the shareholder at a personal level does not affect the primary tax benefit associated with an S Corporation, which is the avoidance of a dividend tax in addition to a tax on corporate earnings.[97] This benefit can

92. *Id.*

93. *Id.*

94. In this regard, the case of *Gross v. Commissioner* is a good example. In *Gross,* the Tax Court held that "[w]e believe that the principal benefit that shareholders expect from an S corporation election is a reduction in the total tax burden imposed on the enterprise. The owners expect to save money, and we see no reason why that savings ought to be ignored as a matter of course in valuing the S corporation." *Gross,* 1999 WL 549463 (page reference unavailable on WL). The Tax Court refused to allow a "hypothetical corporate tax rate in excess of the zero-percent actual corporate tax rate" to be considered in valuing an S corporation and instead required that no corporate tax be applied to the S corporation's earnings. *Id.*

95. 26 U.S.C.A. § 1363 (2005).

96. *See, e.g.,* Fisher.

97. *See, e.g., Byrne v. Commissioner of Internal Revenue,* 361 F.2d 939, 942 (7th Cir.1966)

be captured fully while employing an economically rational approach to valuing an S corporation that is net of personal taxes.[98] To ignore personal taxes would overestimate the value of an S corporation and would lead to a value that no rational investor would be willing to pay to acquire control.[99] This is a simple premise—no one should be willing to pay for more than the value of what will actually end up in her pocket—that can best be firmly grasped through a concrete example.

Assume that Delaware Radiology receives $100 in annual earnings. If Delaware Radiology was organized as a C corporation, its earnings after tax would be $60, assuming, as is the usual custom, that the effective corporate tax rate is 40%. Then, assume that Delaware Radiology distributes all of its post-tax earnings to its shareholders in the form of a dividend. The shareholders would receive total post-tax distributions of $51, after an assumed dividend tax of 15% is applied to the $60 after-tax earnings. That is, a shareholder would experience an effective tax rate of 49% after corporate income and dividend taxes.

■ Now, consider the post-tax benefits of $100 in income to Delaware Radiology's stockholders, using its actual status as an S corporation. In that scenario, the shareholders would receive all $100 in earnings as distributions and be subject only to one shareholder-level tax. Thus, the shareholders would be responsible for paying taxes on the $100 at their individual tax rates. I will also assume that rate to be 40% because the Broder and Kessler Groups are comprised of affluent physicians who pay at the highest marginal rate.[100] Therefore, every dollar of Delaware Radiology's earnings would be taxable at the stockholder level at the highest marginal tax rate. The shareholders in Delaware Radiology, an S corporation, would be able to pocket $60 after tax if all earnings were distributed. The difference is clear: Delaware Radiology's status as an S corporation allowed the shareholders to pocket $60 of $100, whereas if Delaware Radiology was a C corporation, the shareholders could pocket only $51 of the $100.[101]

("We agree with the observation of the Tax Court that the [S Corporation] statute is designed to permit a qualified corporation and its shareholders to avoid the double tax normally paid when a corporation distributes its earnings and profits as dividends and this is accomplished in a specified manner which does not involve ignoring the corporate entity."); Practising Law Institute, 546 PLI/Tax 249 *Organizing the Corporate Venture* § 1301 (2002) ("This re-inversion of rates lessened the S corporation shareholder's advantage of being taxed directly on corporate income. Yet, the primary tax advantage of being an S corporation shareholder—i.e., the ability to receive corporate income with only a single level of tax imposed—remains intact. This must be compared to the double tax paid on a C corporation's income (i.e., once at the corporate level, and again at the shareholder level when distributed) in considering the tax benefit of using an S corporation, rather than a C corporation, for business operations.");

Mercer 9 ("The S election relieves one layer of taxation at the corporate level, providing the potential for greater cash flow at the shareholder level.").

98. Fisher 22.

99. *Id.* at 18 ("[W]e demonstrate that ignoring taxes in a DCF analysis when valuing an S corporation potentially leads to an overestimation of value."); *id.* at 22 ("A rational investor will only pay up to the present value of an investment's expected cash flows, net of personal taxes.").

100. Currently, at the federal level, the highest personal tax rate is 35%, and the highest corporate tax rate is 38%. Thus, taking into account state taxes, it is reasonable to assume a 40% personal tax rate.

101. This would not be the case if 1) no distributions were being paid by the S corporation

In valuing Delaware Radiology, therefore, it would overstate the value taken from the Kessler Group to require the Broder Group to pay the Kessler Group $37.50 for its share of every $100 of future pre-tax earnings. That cash flow, after the favorable S corporation tax treatment, would not be worth $37.50 to the Broder Group, but only $22.50. The issue, though, is that tax affecting Delaware Radiology at a 40% level (or C corporation level) would not recognize any S corporation value that flowed to the Kessler Group or compensate the Kessler Group for its involuntary removal as shareholders in a profitable S corporation. To be consistent with Delaware law, I must tax affect Delaware Radiology's future cash flows at a lower level that recognizes the full effect of the Kessler Group's ability to receive cash dividends that are not subject to dividend taxes.

In order to accurately capture the value to the Kessler Group of Delaware Radiology's S corporation status, I have estimated what an equivalent, hypothetical "pre-dividend" S corporation tax rate would be. The following table presents that calculation:

| | C Corp | S Corp | S Corp Valuation |
|---|---|---|---|
| Income Before Tax | $100 | $100 | $100 |
| Corporate Tax Rate | 40% | — | 29.4% |
| Available Earnings | $60 | $100 | $70.60 |
| Dividend or Personal Income Tax Rate | 15% | 40% | 15% |
| Available After Dividends | $51 | $60 | $60 |

This calculation allows me to treat the S corporation shareholder as receiving the full benefit of untaxed dividends, by equating its after-tax return to the after-dividend return to a C corporation shareholder. I will, therefore, apply an effective tax rate of 29.4% to the earnings of Delaware Radiology to measure with the greatest practicable precision the fair value of the Kessler Group's interest in the going concern value of Delaware Radiology.

## VI. The Appraisal Valuation And Fair Value Determination

The preceding analysis addresses most of the major value-affecting issues in the record. The results of that analysis will provide some of the more important inputs I will use in reaching a determination of the fair value of Delaware Radiology on the merger date. That appraisal determination will also determine my award of damages for the purpose of the Kessler Group's entire fairness claim.

to its shareholders or 2) distributions only sufficient to cover tax liability were being distributed to shareholders. The relative value of an S corporation, vis-à-vis a C corporation, to its shareholders is dependent upon the level of distributions paid. For a useful model and analysis, *see, e.g.,* Chris Treharne, *et. al., Valuation of Pass–Through Entities,* American Society of Appraisers 23d Annual Advanced Business Valuation Conference (Oct. 8, 2004). As recognition of the fact that their stockholders must pay taxes on non-distributed earnings, most if not all S corporations distribute a sufficient amount of their profits to cover shareholder tax obligations.

Mercer at 17 ("S corporations who attempt to retain all earnings and not pass through the shareholders' tax distributions will likely find themselves C corporations again, as their shareholders arrange to become ineligible to hold S corporation stock."). This makes intuitive and commercial sense. If all earnings are retained, the S corporation's shareholders must dig into their own pockets to fund the tax liability. If all earnings are retained in a C corporation, the entity is responsible for the corporate level tax. If S corporation shareholders elect to receive no distributions, that can be viewed as a reinvestment of their tax savings in that enterprise.

Both of the experts in the case used a discounted cash flow analysis as the foundation for their valuations of Delaware Radiology. The basic elements of a DCF analysis are not novel and need not be repeated here.[102] In computing my own DCF value for Delaware Radiology on the merger date, I will focus on the major remaining differences between the testimonial experts, then use the resolution of those differences along with the inputs formerly determined to reach a final determination of fair value.

Before I complete that work, a few factors that influence my approach are worth noting. Delaware Radiology is a small, privately owned entity. As shall be seen, using even an income-based approach such as a DCF model to value such an entity has its challenges, principally in the area of calculating a proper cost of capital. In this situation, the absence of both market information about the subject company and good public comparables force the court to rely even more than is customary on the testimonial experts. That reality is inescapable.

■ That has led me to consider carefully which of the two experts, the Broder Group's expert Reed or the Kessler Group's expert Mitchell, was the more reliable. Although I have done my own independent analysis and reach a conclusion materially different than either expert, when there is doubt and there is not a more reliable basis to decide a question, I will use the approach advocated by the expert whose testimony I found more credible and well-grounded in finance and fact. As a general matter, I easily conclude that Mitchell's testimony was far closer to the mark in all respects. Mitchell approached his task in a conservative and restrained manner that, although still reflecting a desire to advance his clients' objectives, reasonably took into account factors limiting the value of Delaware Radiology.

By contrast, Reed's testimony seemed more aggressively driven by his goal of reducing what the Broder Group would be ordered to pay. Moreover, Reed was given marching orders in his work before and after the merger that led him to undervalue Delaware Radiology. Indeed, those orders were such that Reed did not even know he was valuing Delaware Radiology itself before he finished his valuation in October 2003. Rather, he thought he was valuing Delaware I and II until some time between November 2003 and January 2004.[103]

Even when he realized that the value of Delaware III and IV might be considered in this case, Reed took the position that it was impossible to value businesses that were soon to, but not yet, open using a DCF analysis. That position would come as a revelation to finance professors, owners of franchisable retail establishments, and businesspersons of all kinds. Put simply, this did not instill confidence in me and seemed to be a posture designed simply to advance the Broder Group's interest in not according the Kessler Group any share of the value of Delaware III and IV. Likewise, Reed's knowledge of the relevant facts regarding Delaware Radiology seemed unduly constrained by his clients, and his blinkered view of the business impaired his ability to reach a reasoned determination of value. For these rea-

---

**102.** For the standard classroom description, *see* RICHARD A. BREALEY & STEWART C. MYERS, PRINCIPLES OF CORPORATE FINANCE 75–80 (7th ed.2003); BRADFORD CORNELL, CORPORATE VALUATION: TOOLS FOR EFFECTIVE APPRAISAL AND DECISION MAKING 100–41(1993). For a good judicial summary, *see Onti,* 751 A.2d at 917.

**103.** Tr. 596.

sons, I give more weight to Mitchell's testimony and lean on his analysis when there is no better method to break an impasse.

### A. *Calculating Net Cash Flows*

The most important input necessary for performing a proper DCF is a projection of the subject company's cash flows. Without a reliable estimate of cash flows, a DCF analysis is simply a guess. Fortunately, Delaware Radiology was not engaged in a complex business and the operations of Delaware I and II provided a foundation for making some reasonable estimates of future performance. Of even greater utility, Carr of Tri–State made detailed projections of the performance of Delaware I, III, and IV for non-litigation use.[104] Specifically, the following projections existed on the merger date.

██ The projections for Delaware I were used in contemplation of securing financing from the Wilmington Savings Fund Society when Delaware I was being expanded and adding a second MRI magnet. The pro forma projections present the anticipated performance for Delaware I, including scan volume projections, for the two years from October 2003 through September 2005. These were provided to the Kessler Group in October 2003 when the Broder Group was requesting personal guarantees for Delaware I's expansion. The projections for Delaware III also were disclosed to the Kessler Group in October 2003, and these projections were used to secure financing for the equipment to be used at the Center.[105] The projections for Delaware III, then, were prepared by October 2003.[106] Similarly, Carr prepared two-year projections for Delaware IV to secure financing for that Center's equipment, which was provided by PNC Bank on March 9, 2004.[107] Traditionally, this court has given great weight to projections of this kind because they usually reflect the best judgment of management, unbiased by litigation incentives.[108] That is especially so when management provides estimates to a financing source and is expected by that source (and sometimes by positive law) to provide a reasonable best estimate of future results.[109] Therefore, we have regarded with rightful suspicion attempts by parties who produced such projections to later disclaim their reliability, when that denial serves their litigation objective.

Here, the Broder Group has done that in material ways, especially with respect to

---

**104.** Carr also claims that projections for Delaware II were provided to PNC to secure a loan to buy-out the Kessler Group, but no detailed projections are in the record. The only "projections" for Delaware II in the record detail anticipated scan volume and resulting revenue. *See* Jt. Ex. 233. No breakdown of expenses or net income is included in the projections, and Mitchell did not have the Delaware II projections available to him in performing his valuation.

**105.** Jt. Ex. 384 at 44–45 (Deposition of Carr).

**106.** At his deposition, Carr recalled coming up with the projections between October 2003 and April 2004, but because the Broder Group provided them October 16, 2003, it is clear the projections were in existence at that time. *Id.* at 47–48.

**107.** Jt. Ex. 174.

**108.** *See Doft & Co. v. Travelocity.com Inc.,* 2004 WL 1152338, at *5 (Del.Ch. May 20, 2004) ("Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations.").

**109.** Again, it is a felony to knowingly obtain any funds from a financial institution by false or fraudulent pretenses or representations. 18 U.S.C.A. § 1344 (2006). Lenders extract projections as a basis for their lending decision and expect reasonable best estimates, not an acronym bringing to mind the tail of a dog.

Delaware III and IV, by claiming that Carr spent minimal time on those projections and that all the projections were merely "throw-ins" after financing was secured.[110] Reed's valuation is evidence of the disavowal of these projections as he used more pessimistic assumptions regarding the volume of scans that the MRI Centers would produce and the amount of revenue the MRI Centers would receive for each scan. Indeed, as to Delaware III and Delaware IV, Reed did not even come up with cash flow projections, as he considered it impossible to value businesses that had not begun to operate.

For his part, Mitchell used the extant projections as the beginning for his analysis and built off of them in a manner that I find to be reasonable and conservative. In fact, in projecting a reimbursement rate, Mitchell took a more conservative approach than the Broder Group's projec-

tions—he assumed a $601 reimbursement rate as opposed to the $611 rate used by the Broder Group for Delaware I. Also, Mitchell's scan volume projection mirrors the Broder Group's projections for Delaware I. At the end of the Broder Group's projection period, Mitchell chose to employ a month-to-month approach to scan volume growth for Delaware I, which had added a second MRI machine near the end of 2003. Mitchell assumed, for Delaware I, that scans on the first magnet would increase by two per month until it reached its capacity of 435 scans per month. He further assumed that scans on the second magnet at Delaware I would increase by ten per month until its capacity of 435 scans per month was reached.[111] Those assumptions struck me as reasonable and achievable ones.[112]

Mitchell lacked management projections

---

**110.** Much was made at the trial that the projections and pro formas were not used to secure financing but rather were "throw-ins" after the deal had been approved on the basis of the personal guarantees of the Broder Group and Edell. Tr. 421–24. Carr, though, testified that even though these were throw-ins, he put together the pro formas and projections "based on the best of [his] knowledge, that [he] thought these things would do." *Id.* at 424. Also, the expansion of Delaware Radiology into Middletown and Dover was not a speculative, new business venture in a new industry—Tri-State was managing several entities and knew the competitive, business, and regulatory landscape. Delaware Radiology explored these opportunities and did its diligence before making the decision to pursue them. *See, e.g.,* Jt. Ex. 83. Carr was instrumental in pursuing the business opportunities for Delaware III and IV and had as much knowledge as anyone as to their prospects and expectations for profitability. Given his role and his fealty to the Broder Group, the Broder Group is in a poor position to disclaim his projections as having no utility.

**111.** Expert Report of Mitchell 24 (hereinafter "Mitchell Report"). It is worth noting that at the end of Carr's two-year projections, Carr

assumed a scan volume increase of ten scans per month. Mitchell's approach after the end of the Broder Group's projections resulted in a monthly increase of twelve scans, which is not markedly different.

**112.** In contrast, Reed was much more pessimistic. Despite the addition of a second magnet at Delaware I, Reed only projected 23% growth in scans in year one and 24% growth in year two. For the rest of the five-year projection, he assumed 3% annual growth. Expert Report of Reed 34 (hereinafter "Reed Report"). His projection for Delaware II was even more pessimistic—decreasing scans by 14% in year one and 15% in year two. *Id.* He then assumed 3% annual growth. As he did not value Delaware III and IV, there was no scan volume assumption in his original valuation. In order to address the court's desire to have projections that included reading fees at certain rates, he made some basic assumptions in order to complete the post-trial projections, but his methodology is not described at length. Rather, he provided a table of expected monthly scans for the first eighteen months and then increased volume at the rate of inflation.

for Delaware II.[113] But Mitchell did know that Delaware II would experience competition from an MRI Center that opened in the Delaware II market area and that this could dampen Delaware II's volume. Mitchell, therefore, projected that any increase in Delaware II's scans would be offset by competition in year one and then grow at 3.5% annually in years two through five of the five-year projection period.[114] That relatively modest growth rate was achievable.

Finally, Mitchell used the Delaware III and IV estimates prepared by Carr for lenders in determining his scan volume projections used to value these entities. He used Carr's projected growth through month eighteen of the twenty-four month projections and then increased scan volume at Delaware III and IV by five per month through the end of year two and then by two per month until the end of the five-year projection period.[115] Again, Mitchell's projected reimbursement rate was more conservative than Carr's projections—he assumed a $601 rate as opposed to $625 used by Carr.

■ Overall, I find Mitchell's estimated growth realistic and appropriate when compared to the historic scan volume of the MRI Centers and the management projections for new MRI Centers. The more rapid increase in scans at Delaware I is reasonable, given its increased capacity beginning in 2003. Mitchell also properly took into account the competition Delaware II faced from the entrance of a new, competing center in Delaware II's market by assuming more modest growth for it. Finally, Mitchell's reliance on Carr's estimates for Delaware III and IV as the basis for his projection-period growth estimate was reasonable.

■ I also find that Mitchell made reasonable assumptions regarding the revenues that Delaware Radiology would receive for doing scans. Mitchell began by using the same base reimbursement rates as Reed for Delaware I ($601 per scan) and Delaware II ($571 per scan).[116] Mitchell used those reimbursement rates because they were the numbers the Broder Group provided to Reed for the purpose of performing a valuation, and Mitchell found them reasonable. Mitchell held these rates constant throughout his projection period. Reed, by contrast, assumed reductions in reimbursement rates of 9% for Delaware I and II in year two, or 2005, and then increased them at 3%, the rate of inflation, annually.[117] Essentially, the basis for Reed's reduction was speculation by Carr, and Reed's own opinion that Delaware reimbursement rates were high rela-

**113.** The record does contain a skeleton projection for Delaware II prepared by Carr. Jt. Ex. 233. As opposed to the projections for Delaware I, III, and IV, that projection does not contain detailed financial projections. Instead, only scan volume and revenue are projected. I should note that this projection uses a reimbursement rate of $720 per scan for the first year—$119 more than any rate used in this litigation. The second year is projected at $620. Mitchell apparently never received this projection. Reed had the projections but did not rely on them. Tr. 493.

**114.** *Id.* It should be noted, as to competition, that a previous center opened less than one-

half mile from Delaware II shortly after Delaware II opened, but this center closed within eighteen months because Delaware II "was capturing the market share" due to its "name recognition." Tr 786–87.

**115.** Mitchell Report 24–25.

**116.** Reed uses $601/scan for Delaware I even though, in testimony, he claimed that by December 2003 that "had dropped to $567 per scan," but he "questioned ... Mr. Carr ... and [] could not get a satisfactory answer." Tr. 493.

**117.** Reed Report 34.

tive to neighboring states and that they were likely to fall. But the record is devoid of information from more objective sources to substantiate that viewpoint, which, like other elements of Reed's and Carr's testimony, fits with the self-interest of the Broder Group.

Notable in this regard is the assumption that Carr made before this litigation about the reimbursement rates that Delaware III and IV would achieve. The projections Carr prepared for the Broder Group to provide to PNC Bank indicated that Delaware III and Delaware IV would receive approximately $625 per scan.[118] As mentioned, Mitchell reduced this rate to $601 per scan in his projections for Delaware

III and IV, which was consistent with Delaware I's reimbursement rate.[119] Carr's pre-merger estimates, prepared for financing purposes, of a $625 per scan reimbursement rate are telling evidence of the reasonableness of Mitchell's decision to use a constant reimbursement rate for Delaware I and II, given that reimbursement rates had not been reduced previously, and to use that same reimbursement rate of $601 for Delaware III and IV.[120]

By employing Mitchell's reimbursement rates and scan volume growth, I estimate that the MRI Centers would realize the following revenues throughout the five-year projection period from the merger date:

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Delaware I | $4,041,725 | $4,814,010 | $5,661,420 | $6,256,410 | $6,274,440 |
| Delaware II | 2,245,172 | 2,323,970 | 2,405,052 | 2,488,989 | 2,576,352 |
| Delaware III | 549,915 | 1,544,570 | 1,860,696 | 2,033,784 | 2,206,872 |
| Delaware IV | 204,340 | 1,320,998 | 1,716,456 | 1,889,544 | 2,062,632 |

■ Consistent with my conclusion that Mitchell's estimates of cash flows during the five-year projection period are reasonable, I also find his calculation of operating expenses a reliable and accurate representation of Delaware Radiology's historic expense structure. Previously, I addressed my resolution of the parties' dispute about Reading Fees. Because I adopt an approach different from Mitchell's, I deviate from him in handling the

Reading Fee expense. To address that issue, I return the excess Reading Fee profit of 3.8%—the difference between the 17.5% the Broder Group paid itself and the market rate of 13.7%—from Delaware I, III, and IV to the value of Delaware Radiology. Similarly, I return the 1.3% excess Reading Fee profit from Delaware II to the value of Delaware Radiology. On this basis, the MRI Centers' operating expenses are:

**118.** Mitchell Report 25; Jt. Ex. 232. Again, Carr even projected a reimbursement rate of $720 for Delaware II. Jt. Ex. 233.

**119.** *Id.*

**120.** It is worth noting that Delaware I's reimbursement rate, if found by dividing gross revenues by the number of scans, appeared to be around $680 per scan in 2003 and Delaware II's reimbursement rate was approximately $686 per scan in 2003. If anything, the reimbursement rates appear to have increased since Delaware I and II were opened. *See* Mitchell Report 11–12.

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Delaware I | $2,181,146 | $2,567,557 | $2,975,169 | $3,334,909 | $3,464,063 |
| Delaware II | 1,326,364 | 1,371,949 | 1,436,135 | 1,522,849 | 1,638,663 |
| Delaware III | 376,027 | 838,327 | 1,020,320 | 1,120,355 | 1,232,720 |
| Delaware IV | 257,030 | 779,713 | 1,009,823 | 1,105,131 | 1,223,999 |

I then calculate the EBITDA for each MRI Center. To do so, I subtract the income, amortization, and depreciation expenses used by Mitchell in his DCF analysis to calculate earnings before taxes.[121] Consistent with my prior analysis, I also tax affect these earnings—as Mitchell did not—in a manner consistent with Delaware Radiology's status as an S corporation and the shareholder-level benefit received as a result. I apply a tax rate of 29.4% to the before-tax earnings of each MRI Center. The following table states each MRI Center's net income:

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Delaware I | $1,168,118 | $1,450,479 | $1,772,360 | $1,946,814 | $1,915,057 |
| Delaware II | 614,067 | 661,264 | 680,335 | 679,059 | 658,973 |
| Delaware III | 26,934 | 389,689 | 491,242 | 549,577 | 599,153 |
| Delaware IV [122] | ($169,566) | 186,670 | 309,336 | 370,430 | 415,054 |

Using these net income figures, I reconcile the cash flow determinations by adding back in the non-cash expenses of each entity—interest, depreciation, and amortization—and the increases or decreases in cash attributable to that year's change in working capital. The figures used to perform this reconciliation all come from Mitchell because, having used his non-cash expense numbers to calculate income, I use the same numbers to reconcile the cash flows. I also make one adjustment to address a disagreement between Reed and Mitchell about the propriety of adding in an annual capital expenditure during the projection period. Reed, in his DCF model, projected an annual capital expenditure of $75,000 per year for Delaware I and $37,500 per year for Delaware II.[123] Mitchell included no capital expenditures at all.[124] I include a nominal capital expenditure each year of $5,000 for Delaware I and II, given the age of their equipment, and no annual capital expendi-

**121.** I accept Mitchell's recalculation of amortization and depreciation on a straight-line basis in order to restate the balance sheet on an accrual accounting basis. I should note that in Reed's rebuttal report, he did not indicate any technical errors in Mitchell's calculation of the MRI Centers' expense structure or reformulation of depreciation on a straight-line basis. Reed's only complaints involved the propriety and inclusion of certain expenses, including those already discussed, e.g. Reading Fees and Tri–State management fees. *See generally* Reed Rebuttal.

**122.** I should note that, in calculating this negative net income, I did not apply a carryforward on the loss to lessen tax burdens for future years' positive net income. Rather, because the pro rata reporting of a loss would have an effect on the shareholders' individual reported income in this year, I apply the entire 29.4% tax benefit to year one's earnings for Delaware IV. So, earnings before tax was ($240,178).

**123.** Reed Report 35.

**124.** Expert Rebuttal Report of Mitchell 10–11 (hereinafter "Mitchell Rebuttal").

ture for Delaware III and IV. I find that Reed's addition of very heavy assumed capital investments was unreasonable but also find unrealistic Mitchell's assumption that Delaware I and II would make no capital investments during the projection period.

This results in annual cash flows to invested capital as follows:

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Delaware I | $1,720,018 | $1,513,428 | $1,805,757 | $2,015,424 | $2,015,004 |
| Delaware II | 935,897 | 661,187 | 671,278 | 670,393 | 652,112 |
| Delaware III | 75,801 | 345,667 | 612,430 | 658,142 | 699,250 |
| Delaware IV | (89,921) | 317,092 | 558,054 | 603,334 | 640,934 |

### B. *Calculating Terminal Value*

■ Both experts use a form of the capitalization method to calculate a terminal value for the MRI Centers.[125] Mitchell assumed a constant perpetuity growth rate of 4%. Reed assumed a perpetuity growth rate of 3%. As between the two, I find Mitchell's rate more realistic. Reed essentially assumes no real growth in the value of Delaware Radiology after the projection period, which I believe is unduly pessimistic. Mitchell captures a modest increment of growth for the MRI Centers above the growth in the entire economy that is realistically achievable, and I adopt his perpetuity assumption.

■ I depart from Mitchell in one material respect in calculating Delaware Radiology's terminal value. Mitchell assumed no capital expenditures during the terminal period in an alleged attempt to capture value from his assumption that the MRI equipment would last well beyond the end of its period of financing, which would allow the MRI Centers to have a period where they would be making no payments on their equipment.[126] Essentially, I find

credible the trial testimony that the useful life of the MRI equipment does exceed the period of financing, but I also find that, at some point, replacement will become necessary. In order to capture both the value of the debt-free period and the future leases, I use a terminal period expense of $130,500 per magnet that is intended to reflect a future operating lease on equipment. This is 75% of the deduction of $174,000 per magnet that Reed proposed, taking into account my determination that Delaware Radiology is likely to enjoy periods of relatively greater profitability because of the durability of its paid-off MRI machines.[127] Using these assumptions, the undiscounted terminal value for each entity is:

| | Terminal Value |
|---|---|
| Delaware I | $11,750,133 |
| Delaware II | 3,716,104 |
| Delaware III | 3,349,820 |
| Delaware IV | 2,557,786 |

**125.** *See* Shannon P. Pratt, et. al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies 215–16 (4th ed.2000) (discussing the two basic methods of calculating terminal value) (hereinafter, "Valuing a Business").

**126.** Tr. 893–94.

**127.** Reed Report 36.

## C. Calculating The Weighted Average Cost Of Capital ("WACC")

■ The experts also haggle over the correct discount rate to calculate the value of the future expected cash flows of Delaware Radiology on the merger date. Testimonial feuds about discount rates often have the quality of a debate about the relative merits of competing alchemists. Once the experts' techniques for coming up with their discount rates are closely analyzed, the court finds itself in an intellectual position more religious than empirical in nature, insofar as the court's decision to prefer one position over the other is more a matter of faith than reason.

This unfortunate reality flows from the status of principles of corporate finance. Even as to public companies, there is much dispute about how to calculate the discount rate to use in valuing their future cash flows, even when one tries to stick as closely as possible to the principles undergirding the capital asset pricing model and the semi-strong form of the efficient capital markets hypothesis. Witness the serious academic debate about whether the so-called size premium received by investors in smaller public companies is a durable indicia of their greater risk, or whether there are attributes of stocks with a low book-to-market ratio that require the consideration of that factor in estimating a discount rate.[128] And not all public compa-nies have a sufficient public float for trading in their shares to provide a reliable beta for use in calculating their cost of capital, forcing a resort to the use of data from the industry or so-called comparable companies.

Situations like this one inspire even less confidence, when experts are required to calculate a cost of capital for a very small, non-public company, for which neither of the experts has identified reliable public comparables. In this context, the ability of the experts or the court to hew literally to the teaching of the high church of academic corporate finance is essentially non-existent. At best, the experts and the court can express their reverence by trying to come up with a proxy that takes into account concerns addressed by CAPM and ECMH.

The experts in this case have used the proxy that has found the most favor among professional appraisers: the so-called "build-up model." The build-up model begins with the core factors considered by CAPM, a risk-free rate and an equity premium rate. From there, however, the build-up model begins to diverge from CAPM. Under the build-up method, beta is not considered. A size premium, used consistently with the practice of most current users of CAPM in the appraisal and valuation context,[129] is de rigueur un-

---

**128.** See BREALEY & MYERS 201–02, 356–57 (discussing the academic debate about the empirical evidence regarding the relationship of stock returns, firm size, and book-to-market ratio on the proper way to calculate cost of capital); Eugene F. Fama & Kenneth R. French, *The Cross–Section of Expected Stock Returns*, 47 J. FIN. 427 (1992) (hereinafter "Cross Section"); Eugene F. Fama & Kenneth R. French, *Size and Book–to–Market Factors in Earnings and Returns*, 50 J. FIN. 131 (1995).

**129.** In other words, there are many adherents of CAPM who believe that the superior per-formance of small stocks over time is a relevant factor to be considered in calculating a cost of capital. The magnitude of this superiority is a question of great debate, as are the questions of whether the gap is eroding, has eroded to insignificance, or was never significant, when all factors are considered. What appears clear is that serious adherents to the essential reasoning behind ECMH and CAPM—*e.g.*, Fama & French—believe the small stock factor to be important. From my experience, most testimonial experts and investment bankers using CAPM tend to accept the size factor as relevant.

der the build-up model. Much more heretical to CAPM, however, the build-up method typically incorporates heavy dollops of what is called "company-specific risk," the very sort of unsystematic risk that the CAPM believes is not rewarded by the capital markets and should not be considered in calculating a cost of capital. The calculation of a company specific risk is highly subjective and often is justified as a way of taking into account competitive and other factors that endanger the subject company's ability to achieve its projected cash flows. In other words, it is often a back-door method of reducing estimated cash flows rather than adjusting them directly. To judges, the company specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick.

That reality manifests itself in this case, where both Mitchell and Reed used the build-up method to estimate Delaware Radiology's cost of capital.[130] The table below shows their application of the build-up method to come up with a cost of capital for Delaware I:

| Mitchell's Discount Rate | | Reed's Discount Rate | |
|---|---|---|---|
| Risk free rate | 5.01% | Risk free rate | 4.93% |
| Equity premium risk | 7.20% | Equity risk premium | 7.00% |
| Industry risk premium | (4.51%) | Size risk effect | 9.16% |
| Size premium | 9.82% | Specific company risk | *3.50%* |
| Specific company risk | *2.00%* | Equity discount rate | 24.59% |
| Equity discount rate | 19.52% | Cost of Debt | *3.95%* |
| WACC [131] | 18.64% | WACC (84.7% equity, 15.3% debt) [132] | 21.4% |

As can be seen, the disparity in equity discount rates primarily results from Mitchell's use of a negative industry risk premium, based on Ibbotson's data, of 4.51%. Absent this industry risk, Reed and Mitchell would be approximately 0.5% apart in their equity discount rates. But that difference overstates the similarity of their analyses. After all, Reed uses a company specific risk premium of 3.5% and Mitchell uses only a 2% figure. Neither explained their estimates with any

130. That is, both experts essentially calculated the discount rate consistent with the leading non-academic treatise. *See* PRATT, VALUING A BUSINESS 163. Interestingly, Pratt does not use the precise nomenclature of the "build-up method" in his larger treatise. *See id.* at 160–65 (discussing the build-up method, while never using that name). But, in his valuation text for lawyers, he specifically refers to this method of calculating a discount rate as "the build-up model." SHANNON PRATT, THE LAWYER'S BUSINESS VALUATION HANDBOOK: UNDERSTANDING FINANCIAL STATEMENTS, APPRAISAL REPORTS, AND EXPERT TESTIMONY 120 (2000). To be fair, Pratt recognizes the inherent subjectivity of the specific company risk factor, though, by stating that this factor is a matter of the analyst's judgment. PRATT, VALUING A BUSINESS 163.

131. This is the WACC for Delaware I only, given the different debt-equity structures of the various MRI Centers.

132. This is Reed's cost of capital for Delaware I. The cost of capital he used for Delaware II was 22.4%, which was a result of factoring in specific company risk at 4.50% and a slightly higher cost of debt component. Similarly, Reed increased the equity discount rate by an additional 1% for Delaware III and an additional 2% for Delaware IV.

confidence-inspiring precision. Even as to the small stock premium, there is more than a 0.6% difference.

In view of the unavoidable imprecision of the exercise, I adopt Mitchell's approach for use in my remedy award. I do so in large part because of my determination that his analysis is, on balance, the more reliable. I also do so because his approach to calculating the discount rate comes the closest to putting into practice the thinking behind the CAPM, in circumstances when CAPM cannot be applied in its pure form. Mitchell's inclusion of a small stock premium is consistent with a good deal of academic and practitioner thinking about CAPM.[133]

More important, I regard Mitchell's consideration of the lower industry risk for companies like Delaware Radiology to be a fair proxy for beta in a circumstance when beta cannot be measured directly. Under the CAPM, the equity risk premium is not used in isolation to estimate the subject company's cost of capital. Rather the equity risk premium is adjusted by an estimate of the systematic risk of the subject company reflected by its actual or estimated beta. The industry return data that Mitchell uses is an acceptable substitute for that adjustment in this situation when a beta cannot be estimated.[134] Mitchell testified that the negative risk premium he employed was consistent with market return data from Ibbotson's indicating that investments in a health care industry business present less market risk than average.[135]

When viewed as a whole, the equity discount rate that Mitchell calculated for Delaware I, II, III, and IV is quite reasonable, reflecting a substantial rate of over 19%. In coming to his cost of capital determination for each of the MRI Centers, then, Mitchell kept all factors constant except for their various borrowing rates and levels of debt. I find that approach more reasonable than Reed's approach of varying his company specific risk premium MRI Center by MRI Center, largely for reasons already taken into account by his reduction in the projections he used in his DCF analysis.[136] Mitchell's own analysis also contains a subjective

133. E.g., Rolf W. Banz, *The Relationship between Return and Market Value of Common Stocks*, 9 J. Fin. Econ. 3 (1981); Fama & French, *Cross Section*; Pratt, Valuing a Business 170.

134. Essentially, the industry risk is used in place of calculating a beta, and Shannon Pratt states that the equity risk premium "[m]ay be modified by one or more coefficients, such as beta, based on the capital asset pricing model...." *See* Michael Barad & Tara McDowell, Ibbotson Associates, Capturing Industry Risk in a Buildup Model 1 (2002) *available at* http://www.ibbotson.com/download/research/CapturingIndustryRiskinaBuildupModel.pdf ("Most appraisers make an industry-based adjustment in calculating a firm's cost of equity. A practitioner using the Capital Asset Pricing Model already includes industry risk through a beta measure; however, when using the buildup method, it must be added in the form of a risk premium.").

135. Tr. 891–92. Reed does not challenge the industry risk number that Mitchell obtained from Ibbotson's. Rather, he challenges the use of an industry premium for Delaware Radiology because of its size. Tr. 646. Mitchell, though, notes that in Ibbotson's calculation of the industry risk premium, one of the companies analyzed generates approximately $17 million annually in revenue, which is not out of line with the revenue achieved cumulatively by the MRI Centers and other Broder Group centers. Tr. 891–92.

136. *See* Pratt, Valuing a Business 181 ("The analyst must be especially careful to avoid undue double counting, such as reflecting a negative factor fully by a reduction in the same economic income projection, and then magnifying the effect by an increase in the discount rate.").

specific company risk premium of 2%, the quantification of which cannot be explained by reference to objective factors. I will not quibble with including that factor, which reinforces the conservatism of Mitchell's final cost of capital.

■ The exhibits to Mitchell's expert report suggest that Mitchell correctly weighted the debt of the MRI Centers and the equity in the MRI Centers as of December 2003.[137] He ran several iterations in order to achieve the correct WACC value, so I will apply his values to determine present value.[138] Those values are:

| | WACC |
| --- | --- |
| Delaware I | 18.64% |
| Delaware II | 18.79% |
| Delaware III | 18.55% |
| Delaware IV [139] | 15.57% |

### D. Calculating The Fair Value Of Delaware I, II, III, And IV

■ The projected cash flows and terminal value stated in present value terms result in each MRI Center having the following total enterprise value as of January 20, 2004.

| | Total Entity Value |
| --- | --- |
| Delaware I | $10,480,021 |
| Delaware II | 3,840,299 |
| Delaware III | 2,739,876 |
| Delaware IV | 2,410,842 |

### E. What To Do About Delaware V?

■ The preceding analysis leaves one question unresolved: what to do about the value of Delaware V? Because Delaware V was not formed until several months after the merger, no pre-merger projections were available. But the facts convince me that a future Sussex County MRI Center was envisioned by the Broder Group and Edell as the logical next step in the southward movement of Delaware Radiology— indeed, that concept was discussed with Edell as early as 1998.[140] Although Mitchell performed a valuation of Delaware V based on projections calculated by Carr, I find that Mitchell's valuation did not have the same reliability as his valuations of Delaware III and IV based on the remoteness in time of Delaware V to the merger. That leaves me with a remedial gap, which I fill conservatively. I will set the value of the Delaware V opportunity at a conservative 33% of Delaware IV's total value to Delaware Radiology, including the excess

137. *See* Mitchell Report Exs. 18, 31, 43, 54. His initial WACC values were modified slightly after the trial in a submission dated January 31, 2006. I apply the new WACC values detailed in that letter. Gocial Gerstein Letter to Cathy Reese, Esq., Jan. 31, 2006.

138. Admittedly, the WACC numbers are no longer precisely correct because, in performing my own valuation and arriving at different entity values than Mitchell, the relative debt and equity weights will have changed. These changes, at most, are relatively insignificant, result from the natural imperfect nature of the appraisal inquiry, and do not alter the reality that the use of Mitchell's WACC num-

bers will provide a responsible present value of Delaware Radiology. This court is not an investment bank and does not have a store of DCF software available to allow us to run iterative exercises. Instead, as judges, we must do the best we can with the record the parties provide us.

139. The Delaware IV WACC is significantly lower because of its presumed initial reliance on debt that is available at a lower cost than equity and because that debt comprises a higher proportion of its capital structure in comparison to the other MRI Centers.

140. *See* Tr. 703.

profit from Reading Fees. This gives the Kessler Group value for the Sussex County opportunity open to Delaware Radiology, while taking into account the more inchoate nature of that opportunity. Although this remedy is necessarily imprecise, it is a fitting and conservative one, given the lack of procedural safeguards employed by the Broder Group in effecting the merger, and the refusal to accord the Kessler Group value even for Delaware III.[141] Delaware V's value to Delaware Radiology, then, is $358,845, which is one-third of the total value of Delaware IV.

## F. The Total Value Of Delaware Radiology

▇ From the total enterprise value, I deduct each MRI Center's debt as of December 31, 2003. In addition, as Delaware Radiology was not the 100% owner of any MRI Center, each entity value is multiplied by Delaware Radiology's ownership percentage.[142] I then added back the 3.8% above-market profit from the Reading Fees for Delaware I, III, and IV and the 1.3% from Delaware II. This table[143] details the value of each MRI Center, including excess Reading Fee profit:

| | Delaware I | Delaware II | Delaware III | Delaware IV | Delaware V |
|---|---|---|---|---|---|
| Entity Value | $10,480,021 | $3,840,299 | $2,739,876 | $2,410,842 | |
| Debt at Dec. 31, 2003 | (1,153,200) | (421,746) | (442,730) | (1,343,333) | |
| Control Equity Value | $ 9,326,821 | $3,418,553 | $2,297,146 | $1,067,509 | |
| DE Radiology Ownership | 70% | 60% | 60% | 60% | |
| Value to DE Radiology | $ 6,528,774 | $2,051,132 | $1,378,288 | $ 640,505 | $213,502 |
| Excess Read Profit to DE Ra diology | $ 1,291.285 | $ 190,033 | $ 418,009 | $ 436,031 | $145,343 |

▇ As is indicated below, my analysis results in a value of Delaware Radiology of $13,292,903.22, which results in a per share value of $33,232.26. The Kessler Group's 37.5% ownership of Delaware Radiology has a total value, then, of $4,984,838.71.

| | |
|---|---|
| Total Value of MRI Centers | $13,292,903.22 |
| Shares Outstanding | 400 |
| Value per Share | $ 33,232.26 |
| Kessler Group Shares | 150 |
| Delaware Radiology's Value to Kessler Group | $ 4,984,838.71 |

141. In a belated renewal of an earlier application, the Kessler Group seeks fee-shifting on the basis that the Broder Group's conduct was in extreme bad faith. In support of that position, the Kessler Group points to concerns about the adequacy of the Broder Group's production of evidence regarding Delaware V. Given the circumstances in which the claim for fee shifting was raised, I believe the Kessler Group's application was inexcusably tardy. Moreover, in considering the application, I would also have to consider whether the Kessler Group's own overly-aggressive and time-consuming approach to the litigation made the process unduly expensive at times, which I believe it did. Most important, by making an award that includes the value of the Delaware V opportunity, I take into account the concerns raised by the Kessler Group in a fair manner. For all these reasons, I will not shift attorneys' fees. I will, however, award costs to the Kessler Group as the prevailing party.

142. When determining Delaware Radiology's ownership percentage of Delaware III and IV, I include any percentage owned by a Tri–State entity or Carr.

143. The results of this table are rounded.

■ The results of this analysis not only serve as the foundation for my appraisal award but as the basis for a conclusion that the merger was not financially fair to the squeezed-out minority, the Kessler Group, as a matter of equity.

## VII. *Pre–Judgment Interest*

■ Of course, no remedial decision would be complete without resolving an expensive debate (in terms of the use of judicial time and the payment of attorneys' and experts' fees) over the rate and frequency of pre- and post-judgment interest. The human energy spent on these disputes is wasteful and dispiriting. But until there is a statutory solution, there is no choice.

The Broder Group sought to resolve this dispute unilaterally by depositing an amount of funds equal to the merger consideration payable to the Kessler Group in an escrow account, which paid a very low money market rate of interest of 2.5%. The Broder Group advocates an award of interest at that rate, or, in the alternative, a combination of the weighted average of that rate and an estimate of Delaware Radiology's weighted borrowing rate, which it estimates at prime minus 0.25%, or 4.64%. This results in a pre-judgment interest rate of 3.57%, which the Broder Group suggests that I compound monthly.[144] The Kessler Group advocates a different approach—one that averages a prudent investor rate, 6.4%,[145] and Delaware Radiology's actual cost of borrowing for the MRI Centers, 7.46%, to come up with a rate of 6.9%, which it seeks to have compounded monthly and stated on an annual basis.[146]

This court is said to have "broad discretion to determine the appropriate rate of interest." [147] Using that discretion I award interest at the rate advocated by the Kessler Group.[148] The Broder Group's placement of funds in escrow might have been well-meaning, but it falls short of convincing me to use a money market rate of interest as a factor. The Broder Group placed the funds in escrow without agreement from the Kessler Group on the nature of the investment vehicle or the amount of funds to be escrowed. As it turns out, the amount of funds escrowed falls well short of my award.

■ Given those realities and the remedial purposes to be served by this proceeding, I adopt the Kessler Group's approach, which is one that is consistent with this court's precedents. In appraisal cases, prejudgment interest is "typically awarded on the basis of a combination of the plaintiffs' lost opportunity cost, measured by a prudent investor rate; and the benefit realized by the defendant, measured in terms of the reduction in defendants' borrowing costs." [149] The formula employed by Mitchell comports fully with

---

**144.** Reed Rebuttal 13–14.

**145.** Mitchell's prudent investor portfolio consisted of 20% 91–day U.S. Treasury bills, 20% 10–years to maturity U.S. Treasury notes, 30% investment grade corporate bonds, and a 30% diversified portfolio of stocks using the return on the Standard & Poors 500 Stock Index as a proxy. Mitchell Report 39.

**146.** *Id.* at 38–39.

**147.** *Montgomery Cellular*, 880 A.2d at 226.

**148.** In that regard, I find that Mitchell's use of the actual borrowing rates for the MRI Centers to be permissible.

**149.** *Ryan*, 709 A.2d at 705.

that approach,[150] as does the use of monthly compounding.[151] As a further matter, given the self-interested nature of the merger and my finding that the terms were financially unfair, my discretion is properly exercised in favor of the more generous, but still responsible, rate of interest proposed by the Kessler Group.

### VIII. *Conclusion*

For the foregoing reasons, I find that the merger was unfair and that the Kessler Group therefore prevails on its fiduciary duty claim. The remedy for that claim, however, is identical to my appraisal award. Thus, the Kessler Group shall receive a judgment equal in amount to $33,232.26 per share of Delaware Radiology it owned, or a total of $4,984,838.71. The appraisal award is the obligation of Delaware Radiology, as the surviving entity in the merger, but the equitable award is the obligation of the members of the Broder Group, jointly and severally. Interest shall run on that award from the merger date at a rate of 6.9%, compounded monthly until the date of full payment. The defendants shall pay the Kessler Group's costs. The Kessler Group shall present a conforming final judgment, upon notice as to form by the Broder Group, within ten days.

---

150. *See Gonsalves v. Straight Arrow Publishers, Inc.*, 2002 WL 31057465, at *13 (Del.Ch. Sept. 10, 2002).

